**CLARKSON LAW FIRM, P.C.**
Ryan J. Clarkson (SBN 257074)
*rclarkson@clarksonlawfirm.com*
Bahar Sodaify (SBN 289730)
*bsodaify@clarksonlawfirm.com*
Alan Gudino (SBN 326738)
*agudino@clarksonlawfirm.com*
Samuel M. Gagnon (*pro hac vice*)
*sgagnon@clarksonlawfirm.com*
22525 Pacific Coast Highway
Malibu, CA 90265
Tel: (213) 788-4050
Fax: (213) 788-4070

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

ALEJANDRINA CORTEZ, TULIISA MILLER, and JAROSLAW WOJCIECHOWSKI, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

HANDI-CRAFT COMPANY, INC.,

Defendant.

Case No. 4:24-cv-03782-YGR
**FIRST AMENDED CLASS ACTION COMPLAINT**

1.  VIOLATION OF UNFAIR COMPETITION LAW (CAL. BUS. & PROF. CODE §§ 17200, *ET SEQ.*)
2.  VIOLATION OF FALSE ADVERTISING LAW (CAL. BUS. & PROF. CODE § 17500, *ET SEQ.*)
3.  VIOLATION OF CONSUMERS LEGAL REMEDIES ACT (CAL. CIV. CODE §§ 1750, *ET SEQ.*)
4.  BREACH OF WARRANTY
5.  UNJUST ENRICHMENT

**JURY TRIAL DEMAND**

*(sidebar)* Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

1

**TABLE OF CONTENTS**

2

**Page No.**

3  I.    INTRODUCTION ......................................................................................................1

4  II.   JURISDICTION ......................................................................................................11

5  III.  VENUE ....................................................................................................................11

6  IV.   PARTIES .................................................................................................................12

7        A.    Plaintiffs .......................................................................................................12

8        B.    Defendant .....................................................................................................15

9  V.    FACTUAL ALLEGATIONS ...................................................................................15

10       A.    Microplastics Harm Human Health .............................................................15

11       B.    The Products Are Made of Polypropylene Plastic and Are Exposed to Heat Through

12             Ordinary Use ................................................................................................20

13       C.    The Material Omission Misleads Reasonable Consumers About the Products' Safety

14             and Conceals the Presence of Harmful Microplastics ................................25

15       D.    The "BPA Free" Claim Lulls Consumers Into a False Sense of Security that Further

16             Hides the Material Omission ........................................................................25

17       E.    Plaintiffs and Reasonable Consumers Were Misled by the Material Omission and

18             Representation into Buying the Products......................................................27

19       F.    The Products are Substantially Similar........................................................32

20       G.    No Adequate Remedy at Law ......................................................................33

21  VI.  CLASS ACTION ALLEGATIONS .........................................................................34

22  VII. CAUSES OF ACTION ............................................................................................38

23       COUNT ONE ...........................................................................................................38

24             "Unfair" Prong ............................................................................................40

25             "Fraudulent" Prong ......................................................................................42

26             "Unlawful" Prong ........................................................................................43

27       COUNT TWO ...........................................................................................................44

28       COUNT THREE .......................................................................................................46

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

i

1

COUNT FOUR ............................................................................................49

2     COUNT FIVE .............................................................................................51

3  VIII.  PRAYER FOR RELIEF ............................................................................52

4  IX.    DEMAND FOR JURY TRIAL ................................................................53

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

FIRST AMENDED CLASS ACTION COMPLAINT

**COMPLAINT**

1.      Plaintiffs Alejandrina Cortez, Tuliisa Miller, and Jaroslaw Wojciechowski ("**Plaintiffs**"), individually and on behalf of all others similarly situated, as more fully described herein (the "**Class**" and "**Class Members**"), bring this class action complaint against Defendant Handi-Craft Company, Inc. ("**Defendant**"), and allege the following based upon information and belief, unless otherwise expressly stated as based upon personal knowledge.

## I.      INTRODUCTION

2.      **Overview.** In a world filled with potential hazards, parents and other caregivers must navigate a minefield of consumer products designed for infants and young children. They strive to shield vulnerable children from harm and reduce their exposure to everyday risks, remaining constantly on guard against the introduction of unnecessary and dangerous substances into their homes. Although Defendant is fully aware of these well-founded parental fears, it has engaged in a campaign of reckless deceit by marketing its Dr. Brown's baby bottles and sippy cups (the "**Products**") as suitable for babies and young children when, in reality, the Products leach harmful microplastics directly into the food and drink of vulnerable babies and young children. This disregard for society's most vulnerable members has placed the health and welfare of millions of children in jeopardy and has duped consumers out of millions of dollars. Defendant has, in effect, callously brought to life every parent's worst nightmare: unknowingly exposing their children to harm with a product they reasonably believed was safe.

3.      **Material Danger and Omission.** To increase profits and gain an unfair advantage over its lawfully acting competitors, Defendant misleadingly markets, advertises, labels, and packages certain of its baby and infant bottles and cups. Specifically, Defendant fails to inform consumers that when the Products are heated as intended for ordinary use, they leach harmful microplastics that cause long-term health complications for children—including damaging children's digestive tracts, immune systems, and reproductive systems (the "**Material Omission**"). *See* **Exhibit 1** (Product Images). The Material Omission leads reasonable consumers into believing that the Products do not pose any risk of harm, thus lulling reasonable consumers into a false sense of security. Defendant fails to provide any warning to consumers regarding the leaching of harmful

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

microplastics when the Products are used as intended, despite its knowledge of the risks. Defendant has thus breached legal obligations to consumers by not stating expressly, clearly, and conspicuously on the Products' front packaging and labels that the Products pose severe health risks for children—the **Material Danger**.

4.     **Consumer Expectation of Safe Products in the Marketplace.** Consumers have the reasonable expectation of safety when buying products in the marketplace. Consumers trust that if a product is being sold, that it is not harmful. Consumers further rely on manufacturers of products to warn consumers if this minimal expectation of safety is not met, expecting that manufacturers warn of any potential danger associated with the product. Consumers expect manufacturers to be diligent in ensuring that products in the marketplace do not expose consumers to harm, or at least to clearly warn them when products do expose consumers, especially babies and toddlers, to serious health risks with ordinary use. Defendant takes advantage of these consumer expectations by failing to disclose the Material Danger to consumers, thereby misleading consumers into believing that the Products are safe—*i.e.*, that they do not pose the Material Danger.

5.     **Baby Products are Inherently Represented as and Expected to be Safe.** Consumers rightfully expect that products in the marketplace are free from harmful substances and chemicals, especially products intended for babies and infants like the Products here. This expectation is reasonable, as the most vulnerable members of society should be the most protected by manufacturers. Not exposing children to harm is consumers' top concern when making purchasing decisions about baby products, and they reasonably expect manufacturers to warn them if there are any safety concerns with a product. Consumers place further trust into the Products' safety because the Products are labeled as "# 1 Pediatrician Recommended," which conveys to consumers that the Products are industry leading and thus do not pose risks like the Material Danger. The Products, which are bottles for babies and infants, however, fail to meet this standard by leaching harmful microplastics into food consumed by these young children when heated as intended for ordinary use. The Products therefore fail to meet the reasonable consumer expectation of being free from Material Danger.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

6.      **The "BPA FREE" Claim Furthers Consumer Deception and Lulls Consumers into False Sense of Security.** In addition to the reasonable expectation that the Products are suitable for babies and infants, consumers are further deceived and misled by Defendant's "BPA FREE" claim on the Products' front labels. "BPA" refers to Bisphenol A, a chemical used to manufacture polycarbonate plastics that leaches into food and beverages, especially when heated. BPA can cause negative health effects on the reproductive system, child development, metabolic disorders, obesity, endocrine disorders, and the nervous system.[1] BPA can also damage DNA, cause oxidative stress, and promote certain breast cancers.[2] Bottles made with BPA present similar dangers to bottles made from polypropylene plastic, like the Products are here. This is because bottles with either composition leach harmful substances when heated and thus negatively impact the human digestive system, immune system, and reproductive system. The "BPA FREE" claim therefore furthers consumer deception by creating a false sense of security as to the safety and quality of the Products that further misleads consumers to believe the Products do not pose the risk of the Material Danger. The reasonable consumer interprets the "BPA FREE" claim to mean the Product is guaranteed, beyond the minimum consumer safety expectation for baby products, to not contain harmful plastic byproducts. By making the affirmative representation of "BPA FREE" and simultaneously omitting the fact that the Products leach harmful microplastics, Defendant deceives reasonable consumers into falsely believing that the Products do not pose any risk of exposing children to harmful plastics.

7.      **The Material Omission Deceives Consumers Through the Unlawful Advertising and Sale of the Products.** The Material Omission misleads reasonable consumers, including Plaintiffs, into believing the Products are suitable for feeding babies and infants. But, in reality, the Products leach harmful microplastics into the bottles' contents, posing a threat to their health. Through false, misleading, and deceptive labeling, advertising, and marketing practices, Defendant exploits parents' desire for safe baby bottles, causing them to pay more for perceived safety. This

---

[1] *Bisphenol A (BPA) Factsheet: National Biomonitoring Program*, CDC (Apr. 7, 2017) https://www.cdc.gov/biomonitoring/BisphenolA_FactSheet.html; M. Thoene, *Bisphenol S in Food Causes Hormonal and Obesogenic Effects Comparable to or Worse than Bisphenol A: A Literature Review*, 12 NUTRIENTS 532 (2020).
[2] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

1   deception harms unsuspecting consumers. Defendant's Material Omission is therefore both

2   misleading and unlawful.

3       8.    **The Products.** The Products at issue are Dr. Brown's-brand baby bottles and sippy

4   cups sold to consumers in the United States and the state of California that contain the Material

5   Omission on their labels and/or packaging, in all sizes, variations, packs, sets, and bundles

6   (collectively referred to as the "Products"). The Products include, but are not necessarily limited to,

7   the following:

8           a.    Dr. Brown's Natural Flow® Anti-Colic Options+™ Narrow Baby Bottle

9           b.    Dr. Brown's Natural Flow® Anti-Colic Options+™ Wide-Neck Baby Bottle

10          c.    Dr. Brown's Milestones™ Narrow Sippy Bottle

11          d.    Dr. Brown's Milestones™ Wide-Neck Sippy Bottle

12          e.    Dr. Brown's Milestones™ Narrow Sippy Straw Bottle

13          f.    Dr. Brown's Milestones™ Wide-Neck Sippy Straw Bottle

14      9.    Below are fair and accurate depictions of front labels representative of each Product

15  category, taken from Defendant's official website, evidencing the Material Omission as well as the

16  "BPA FREE" representation:

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Dr. Brown's Natural Flow® Anti-Colic Options+™ Narrow Baby Bottle**





FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

**Dr. Brown's Natural Flow® Anti-Colic Options+™ Wide-Neck Baby Bottle**





6

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

**Dr. Brown's Milestones™ Narrow Sippy Bottle**



**Dr. Brown's Milestones™ Wide-Neck Sippy Bottle**



Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

FIRST AMENDED CLASS ACTION COMPLAINT

**Dr. Brown's Milestones™ Narrow Sippy Straw Bottle**



FIRST AMENDED CLASS ACTION COMPLAINT

**Dr. Brown's Milestones™ Wide-Neck Sippy Straw Bottle**



FIRST AMENDED CLASS ACTION COMPLAINT

10. **Primary Dual Objectives.** Plaintiffs bring this action individually and on behalf of similarly situated consumers who purchased the Products during the relevant Class Period, with two primary objectives. *One*, Plaintiffs seek on Plaintiffs' individual behalf, and on behalf of the Class/Subclass, a monetary recovery for the price premium they have overpaid for Products as a result of the Material Omission, as consistent with permissible law (including, for example, damages, restitution, disgorgement, and any applicable penalties/punitive damages solely as to those causes of action so permitted). *Two*, Plaintiffs seek on Plaintiffs' individual behalf, and on behalf of the Class/Subclass, injunctive relief to stop Defendant's unlawful manufacture, marketing, and sale of the Products with the Material Omission to avoid or mitigate the risk of deceiving the public into believing that the Products do not pose the Material Danger, by requiring Defendant to change its business practices, which may include one or more of the following: disclosure of the Material Omission on the Products' labels and/or packaging; disclosure of the Material Omission in the Products' advertising; modification of the Products so that they no longer pose a risk of the Material Danger to babies and infants; and/or discontinuance of the Products' manufacture, marketing, and/or sale.

## II.   JURISDICTION

11. This Court has original jurisdiction over the action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the proposed Class consists of 100 or more members; the amount in controversy exceeds $5,000,000, exclusive of costs and interest; and minimal diversity exists. This Court also has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

## III.   VENUE

12. Venue is proper in this District under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District. Specifically, Plaintiff Miller, as detailed below, purchased the unlawful Products in this District, and Defendant has marketed, advertised, and sold the Products within this District.

///

///

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

## IV.   PARTIES

### A.   Plaintiffs

13.   **Plaintiff Tuliisa Miller.** The following is alleged based upon Plaintiff Tuliisa Miller's personal knowledge:

    a.   **Residence.** Plaintiff Miller is a resident of Contra Costa County, in the state of California.

    b.   **Purchase Details.** In or around early 2022, Plaintiff Miller purchased the Dr. Brown's Natural Flow® Anti-Colic Options+™ Narrow Baby Bottle (*see* Exhibit 1-1 [exemplar Product image]) from a Target in Contra Costa County for approximately $20.00 (the "**Miller Purchased Products**").

    c.   **Reliance on Material Omission and Representations**. When making her purchase, Plaintiff Miller relied upon the Material Omission and the representations on the Product's label or packaging. The omission and representations led her to believe that the Product was safe and capable of providing a safe baby bottle that does not pose the risk of the Material Danger.

    d.   **No Actual Knowledge of Falsity.** At the time of her purchase, Plaintiff Miller was unaware that the Product posed the risk of the Material Danger—*i.e.*, that the Product could leach microplastics when used as ordinarily expected.

    e.   **No Notice of Contradictions.** Plaintiff Miller did not observe any disclaimer, qualifier, or other explanatory statement or information on the Product's labels or packaging that disclosed or suggested that the Product leaches microplastics into the liquid/contents therein.

    f.   **Causation/Damages.** But for the Material Omission and representations—*i.e.*, that the Product carries a substantial risk of releasing microplastics when exposed to heat during ordinary use—Plaintiff Miller would not have purchased the Product or would not have paid as much for it.

    g.   **Desire to Repurchase.** Plaintiff Miller continues to see the Products available for purchase and desires to purchase them again if the Products were safe(i.e., if the Products did not pose a risk of the Material Danger) or if the Products' labels allowed Plaintiff to make a fully informed purchase decision.

    h.   **Lack of Personal Knowledge/Expertise to Determine Truth.** Plaintiff Miller does not possess any specialized knowledge, skill, experience, or education in plastic composition, similar to and including the Products. As a result, she is unable to determine whether the Products pose a risk of the Material Danger—*i.e.*, whether the Products are truly a safe choice and free of microplastics.

14.   **Plaintiff Alejandrina Cortez.** The following is alleged based upon Plaintiff Alejandrina Cortez's personal knowledge:

    a.   **Residence.** Plaintiff Cortez is a resident of San Bernardino County, in the state of California.

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

b. **Purchase Details.** In or around January and May 2023, Plaintiff Cortez purchased several Dr. Brown's Natural Flow Anti-Colic Baby Bottles (*see* Exhibit 1-1, 1-2 [exemplar Product image]) from Amazon.com for approximately $6.00 to $20.25 for each Product (the "**Cortez Purchased Products**").

c. **Reliance on Material Omission and Representations**. When making her purchases, Plaintiff Cortez read and relied upon the Material Omission and the representations on the Products' labels or packaging. The omission and representations led her to believe that the Products were safe and capable of providing a safe baby bottle that does not pose the risk of the Material Danger.

d. **No Actual Knowledge of Falsity.** At the time of her purchases, Plaintiff Cortez was unaware that the Products posed the risk of the Material Danger—*i.e.*, that the Products could leach microplastics when used as ordinarily expected.

e. **No Notice of Contradictions.** Plaintiff Cortez did not observe any disclaimer, qualifier, or other explanatory statement or information on the Products' labels or packaging that disclosed or suggested that the Products leach microplastics into the milk or formula.

f. **Causation/Damages.** But for the Material Omission and representations—*i.e.*, that the Products carry a substantial risk of releasing microplastics when exposed to heat during ordinary use—Plaintiff Cortez would not have purchased the Products or would not have paid as much for them.

g. **Desire to Repurchase.** Plaintiff Cortez continues to see the Products available for purchase and desires to purchase them again if the Products were safe (i.e., if the Products did not pose a risk of the Material Danger) or if the Products' labels allowed Plaintiff to make a fully informed purchase decision.

h. **Lack of Personal Knowledge/Expertise to Determine Truth.** Plaintiff Cortez does not possess any specialized knowledge, skill, experience, or education in plastic composition, similar to and including the Products. As a result, she is unable to determine whether the Products pose a risk of the Material Danger—*i.e.*, whether the Products are truly a safe choice and free of microplastics.

15. **Plaintiff Jaroslaw Wojciechowski.** The following is alleged based upon Plaintiff Jaroslaw Wojciechowski's personal knowledge:

a. **Residence.** Plaintiff Wojciechowski is a resident of Santa Clara County, in the state of California.

b. **Purchase Details.** In or around December 2022 and January 2023, Plaintiff Wojciechowski purchased approximately thirteen Dr. Brown's Natural Flow Anti-Colic Baby Bottles (*see* Exhibit 1-1, 1-2 [exemplar Product image]) from Amazon.com and Target.com for approximately $8.00 to $21.00 for each Product (the "**Wojciechowski Purchased Products**").

c. **Reliance on Material Omission and Representations**. When making his purchase, Plaintiff Wojciechowski read and relied upon the Material Omission and the representations on the Product's label or packaging. The omission and representations led him to believe that the Product was safe and capable of providing a safe baby bottle that does not pose the risk of the Material Danger.

---

13

FIRST AMENDED CLASS ACTION COMPLAINT

d. **No Actual Knowledge of Falsity.** At the time of his purchases, Plaintiff Wojciechowski was unaware that the Products posed the risk of the Material Danger—*i.e.*, that the Products could leach microplastics when used as ordinarily expected.

e. **No Notice of Contradictions.** Plaintiff Wojciechowski did not observe any disclaimer, qualifier, or other explanatory statement or information on the Products' labels or packaging that disclosed or suggested that the Products leach microplastics into the milk or formula.

f. **Causation/Damages.** But for the Material Omission and representations—*i.e.*, that the Products carry a substantial risk of releasing microplastics when exposed to heat during ordinary use—Plaintiff Wojciechowski would not have purchased the Products or would not have paid as much for them.

g. **Desire to Repurchase.** Plaintiff Wojciechowski continues to see the Products available for purchase and desires to purchase them again if the Products were safe (i.e., if the Products did not pose a risk of the Material Danger) or if the Products' labels allowed Plaintiff to make a fully informed purchase decision.

h. **Lack of Personal Knowledge/Expertise to Determine Truth.** Plaintiff Wojciechowski does not possess any specialized knowledge, skill, experience, or education in plastic composition, similar to and including the Products. As a result, he is unable to determine whether the Products pose a risk of the Material Danger—*i.e.*, whether the Products are truly a safe choice and free of microplastics.

16. **Plaintiffs' Future Harm.** Defendant continues to market and sell the Products with the Material Omission and material misrepresentation, creating an ongoing harm to consumers. As average consumers without specialized knowledge in plastic composition, including the specific plastic used in the Products, Plaintiffs are particularly vulnerable to this deceptive practice. Despite their desire to purchase the Products again, Plaintiffs face a substantial risk of future injury due to their reasonable but incorrect assumptions about the Products' safety. Given Defendant's continued use of the Material Omission and material misrepresentation, Plaintiffs are likely to believe that the Products have been reformulated to address the issue of microplastic leaching, making them safe for babies and young children. This mistaken belief, fueled by Defendant's ongoing misrepresentations, would lead Plaintiffs to purchase the Products again, exposing them to the same harm they initially experienced. Conversely, Plaintiffs may have to refrain from purchasing the Products in the future, despite wanting to do so, because they cannot rely on the Products' labels to truthfully inform them about the Products leaching microplastics that Plaintiffs want to avoid. Plaintiffs' lack of expertise in plastic composition leaves them unable to independently verify whether the Products have indeed been modified to eliminate the risk of microplastic contamination,

and thus, Plaintiffs' risk of harm is sufficiently real, imminent, and substantial to justify injunctive relief. If reformulation of the Products is impossible, Plaintiffs are still willing to purchase the Products for limited purposes (i.e., traveling or for bringing to a daycare that does not allow glass bottles) or as a more affordable option, if the Products' labels accurately reflected the risk of microplastics. But because of Defendant's unlawful and misleading labels on its Products, the Material Omission and misrepresentation deprives Plaintiffs of the ability to make a fully informed purchasing decision despite their desire to purchase the Products again.

**B.** **Defendant**

17. **Defendant Handi-Craft Company, Inc.** is a corporation incorporated in Missouri, where it also maintains its principal place of business. Defendant was doing business in the state of California at all relevant times. Directly and through its agents, Defendant has substantial contacts with and receives substantial benefits and income from and through the state of California. Defendant is the owner, manufacturer, and/or distributor of the Products. Defendant and its agents promoted, marketed, and sold the Products at issue throughout the United States, including the state of California. The unfair, unlawful, deceptive, and misleading Material Omission on the Products were prepared, authorized, ratified, and/or approved by Defendant and its agents to deceive and mislead consumers in the state of California into purchasing the Products. Additionally, Defendant knew of the falsity of the Material Omission, but it failed to disclose it at the time Plaintiffs and all Class Members purchased the Products, notwithstanding its duty to do so. Further, Defendant had the right and authority, at all relevant times, to disclose the Material Omission, including the time leading up to and through the incident giving rise to the claims asserted herein (including, Plaintiffs' purchases described above, in addition to all Class Members' purchases).

**V.** **FACTUAL ALLEGATIONS**

**A.** **Microplastics Harm Human Health**

18. Microplastics are small plastic particles less than 5 millimeters in diameter that form when solid plastics break down through abrasion, degradation, or chemical processes such as

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

exposure to heat.[3] These tiny particles can have significant adverse effects on human health.[4] Studies show that microplastics alter the composition of gut microbiota, which play a crucial role in digestion, nutrient absorption, and immune system development.[5] Furthermore, microplastics "produc[e] a toxic effect on the digestive tract," that causes irreversible changes in the reproductive axis and central nervous system of offspring after prenatal and neonatal exposure, affect the immune system due to their physicochemical properties, and can cause chronic pulmonary disease.[6]

19.    **Microplastics Are Particularly Harmful to Children.** The dangers of microplastic exposure are particularly severe for infants, as these early encounters with microplastics can pave the way for chronic health conditions that can manifest over a lifetime.[7] Exposure to even low doses of microplastics during a child's early development may cause long-term health complications later in life.[8] Experts in microplastics warn that infants, with their entire lives ahead of them, face a heightened risk of developing lifelong ailments due to their prolonged exposure to microplastics starting from such a young age.[9]

20.    During critical periods of development, such as infancy and early childhood, exposure to microplastics can profoundly impact various bodily systems—including the digestive,

---

[3] *See* Sumon Sarkar, Hanin Diab & Jonthan Thompson, *Microplastic Pollution: Chemical Characterization and Impact on Wildlife*, 20(3) Int. J. Environ. Res. Public Health 1745 (2023).

[4] *See* Raffaele Marfella et al., *Microplastics and Nanoplastics in Atheromas and Cardiovascular Events*, 390 NEW ENGLAND J. MED. 900–910 (Mar. 6, 2024), https://www.nejm.org/doi/full/10.1056/NEJMoa2309822 (concluding that "patients with carotid artery plaque in which [microplastics and nanoplastics (MNPs)] were detected had a higher risk of a composite of myocardial infarction, stroke, or death from any cause at 34 months of follow-up than those in whom MNPs were not detected").

[5] *See* Alba Tamargo et al., *PET Microplastics Affect Human Gut Microbiota Communities During Simulated Gastrointestinal Digestion, First Evidence of Plausible Polymer Biodegradation During Human Digestion*, 12 SCI. REPS. 528 (Jan. 11, 2022), https://doi.org/10.1038/s41598-021-04489-w ("The work presented here indicates that microplastics are indeed capable of digestive-level health effects.").

[6] Nur Hanisah Amran et al., *Exposure to Microplastics During Early Developmental Stage: Review of Current Evidence*, 10 TOXICS 597 (Oct. 10, 2022), https://doi.org/10.3390/toxics10100597.

[7] *Id.*; *see also* Liping Liu et al., *Release of Microplastics from Breastmilk Storage Bags and Assessment of Intake by Infants: A Preliminary Study*, 323 ENV'T POLLUTION (Apr. 15, 2023), at 2, https://doi.org/10.1016/j.envpol.2023.121197 ("Exposure to low doses of [microplastics] during early development may cause perturbation of gas and nutrients exchange and induce long-term health effects.").

[8] Amran, *supra* note 6.

[9] Liping Liu et al., Release of Microplastics from Breastmilk Storage Bags and Assessment of Intake by Infants: A Preliminary Study, 323 ENV'T POLLUTION (Apr. 15, 2023), at 1, https://doi.org/10.1016/j.envpol.2023.121197 ("Infancy is known to be a sensitive window for environmental exposure, which may increase susceptibility to certain diseases in adulthood.").

16

reproductive, central nervous, immune, and circulatory systems—leading to long-term health impairments.[10]

21.     This extreme harm is particularly critical in infants, who may suffer from a wide array of severe health issues because of microplastic exposure. One study found that average levels of fecal microplastics were over ten times higher in infants than adults.[11] Scientists studying microplastics and early child development have therefore emphasized that "enacting solid legislative laws and policies to manage the excessive use of plastic products is crucial; otherwise, the health of ecosystems and living organisms will inevitably deteriorate in the coming years. […] **We feel that the government and industries must exert the most significant effort to protect children from MPs [microplastics] exposure. These procedures include avoiding plastic contact of children's meals**[.]"[12]

22.     Yet another study emphasized the consequences of microplastic ingestion on cardiovascular systems, finding that subjects with "carotid artery plaque in which microplastics were detected had a higher risk of a composite myocardial infarction, stroke, or death from any cause."[13]

23.     Despite the clear dangers, Defendant actively conceals the known risks associated with microplastic exposure, depriving parents of the ability to make informed choices about their children's health and well-being. The Products' Material Omission and the "BPA FREE" and "#1 Pediatrician Recommended" representations work in tandem to create a false sense of security, leading parents to believe that their children will be safe from the severe consequences of ingesting microplastics. In reality, parents are exposing their children to "irreversible changes in the reproductive axis and central nervous system," among other harms.[14]

---

[11] News Release, AM. CHEM. SOC'Y, *Infants Have More Microplastics in Their Feces Than Adults, Study Finds* (Sept. 22, 2021), https://www.acs.org/pressroom/newsreleases/2021/september/infants-have-more-microplastics-in-their-feces-than-adults-study-finds.html.
[12] Amran *supra* note 6.
[13] Marfella, *supra* note 4.
[14] Amran *supra* note 6.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

24.     **The Products are Intended for Daily and Constant Use.** The Products at issue—baby bottles and cups—are not occasional-use items. They are essential feeding devices that infants and young children use many times every single day.[15] As infants need to be fed every 2-4 hours daily depending on their stage of development, they have their bottles or cups in or near their mouths for extended periods.[16] This constant, repeated exposure to the Products significantly amplifies the risk posed by the microplastics they leach.

25.     **Microplastics Bioaccumulate with Each Use.** Due to their small size, microplastics bioaccumulate.[17] Bioaccumulation results in compounding negative health effects, such as growth and reproduction issues, DNA damage due to oxidative stress, inflammation, physical stress, weakened immunity, histological damage, or even death.[18] Microplastics transmit into the human body best through digestion or oral intake.[19] From there, microplastics can leach toxic additives in the acidic environment of the stomach and cause liver inflammation.[20] For people with inflammatory bowel disease (IBS), the microplastics accumulation in feces is directly related to disease severity.[21] Those suffering from liver damage also show 8-fold increase in plastic contamination compared to liver samples from healthy individuals.[22] This illustrates how microplastics are directly tied to bodily harm and how the greater the amount of microplastics in one's body, the greater the harm. Thus, each instance of exposure to microplastics compounds the potential for long-term harm. For example, the quantity of microplastics in brain samples collected

---

[15] Mary L. Gavin, *Formula Feeding FAQs: How Much and How Often*, KIDS HEALTH (November 2021)                    https://kidshealth.org/en/parents/formulafeed-often.html#:~:text=Newborns%20and%20young%20babies%20should,about%20every%203%E2%80%80%934%20hours.
[16] *Id.*
[17] Yue Li et al., *Microplastics in the human body: A comprehensive review of exposure, distribution, migration mechanics, and toxicity*, 946 Science of the Total Environment (June 22, 2024), at 5, https://doi.org/10.1016/j.scitoenv.2024.174215.
[18] *Id.*
[19] *Id.*
[20] Dunzhu Li et al., *Microplastic Release from the Degradation of Polypropylene Feeding Bottles During Infant Formula Preparation*, 1 NATURE FOOD 746, 746 (Nov. 2020), https://doi.org/10.1038/s43016-020-00171-y.
[21] Zehua Yan et al., *Analysis of Microplastics in Human Feces Reveals a Correlation between Fecal Microplastics and Inflammatory Bowel Disease Status*, 56 Environmental Science & Technology 414 (Dec. 22, 2021), https://doi.org/10.1021/acs.est.1c03924
[22] Thomas Horvatits et al., *Microplastics detected in cirrhotic liver tissue*, The Lancet (July 11, 2022), https://www.thelancet.com/pdfs/journals/ebiom/PIIS2352-3964(22)00328-0.pdf.

18

in 2024 was about 50% higher than in brain samples collected in 2016—demonstrating the alarming reality of bioaccumulation.[23] For infants and young children, who are in a critical stage of development, accumulated exposure can have devastating consequences. Parents and caregivers feed their children using the Products unwittingly exposing their vulnerable children to microplastics with each use.

26.    Since Plaintiffs originally filed their complaint, new studies and articles emerged that further confirm the widespread presence and dangers of microplastics as scientists continue to uncover their harmful effects. A September 2024 study found polypropylene microplastics in every sample of bone marrow tested, demonstrating that microplastics like those shed by Defendant's Products embed themselves deeply into the human body.[24] Another alarming study also published in September 2024 conclusively demonstrated the presence of microplastics in the human brain, with the authors cautioning that their "results should raise concern in the context of increasing prevalence of neurodegenerative diseases."[25] Ingestion of microplastics has also been linked to colon cancer, which is on the rise in young people, and other cancers related to the gastrointestinal tract.[26] A May 6, 2024 study, which is currently pending peer review, shows that brains accumulate ten to twenty times more microplastics than other organs, and that a quarter of those brain samples showed that 0.5% of the weight of the brain tissues were plastic.[27] Significantly, brain samples from people who had died of dementia contained up to *ten times more* microplastic particles than samples of healthy brains.[28]

27.    Defendant's Products are intended for regular use, serving as a means to deliver the essential formula that infants and babies need for their development. However, with each sip, they

---

[23] Douglas Main, *Microplastics are infiltrating brain tissue, studies show: 'There's nowhere left untouched,'* The Guardian (Aug. 21, 2024), https://www.theguardian.com/environment/article/2024/aug/21/microplastics-brain-pollution-health.

[24] Xiaoli Guo, *Discovery and analysis of microplastics in human bone marrow*, 477 J. Hazardous Materials (Sept. 15, 2024), https://doi.org/10.1016/j.jhazmat.2024.135266.

[25] Luís Fernando Amato-Lourenço et al., *Microplastics in the Olfactory Bulb of the Human Brain*,

[26] Bridget Balch, *Microplastics are inside us all. What does that mean for our health?*, AAMC (June 27, 2024), https://www.aamc.org/news/microplastics-are-inside-us-all-what-does-mean-our-health

[27] Matthew Campen, et al., *Bioaccumulation of Microplastics in Decedent Human Brains Assessed by Pyrolysis Gas Chromatography-Mass Spectrometry* (undergoing peer review) (on file with National Library of Medicine at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC11100893/).

[28] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1    unknowingly ingest microplastics, which accumulate in their bodies over time due to continuous

2    use. This buildup increases the risk of serious health issues, including problems with digestion,

3    immune function, reproductive health, and more.[29] This makes Defendant's misconduct even more

4    egregious and underscores the urgent need for accountability.

5        **B.    The Products Are Made of Polypropylene Plastic and Are Exposed to Heat**

6               **Through Ordinary Use**

7        28.    **Defendant Intends for Consumers to Heat the Products.** Plaintiffs and other

8    reasonable consumers understand that the regular and ordinary use of baby bottles involves holding

9    heated liquids (such as formula or breastmilk) and possibly using boiling liquids for sterilization.

10   Defendant instructs consumers, before the first and each use of the Products, to wash the Products

11   and then "place the components in boiling water for five minutes" to sterilize the Products.[30]

12   Defendant also reassures consumers that "[a]ll parts are safe for use in dishwasher (top rack only),

13   electric sterilizer, microwave sterilizer, or boiling water."[31] However, Defendant omits a critical and

14   material fact—that the Products' bottles made of polypropylene "release microplastics with values

15   as high as 16,200,000 particles per litre," and that "sterilization and exposure to high-temperature

16   water significantly increase microplastic release."[32] By advertising and selling the Products without

17   disclosing the material risks associated with heating, Defendant jeopardizes the health and well-

18   being of countless children and misleads parents who trust in the safety of these Products.

19       29.    **Defendant Sells Companion Products to Heat the Products.** Defendant sells Dr.

20   Brown's bottle warmers and sterilizers designed for use with the Products.[33] Defendant advertises

21   and intends that its Dr. Brown's Bottle Sterilizer and Dryer,[34] Dr. Brown's Deluxe Bottle Warmer

---

[29] Li, *supra* note 17.

[30]   *Dr.   Brown's   Bottle   Instructions*,   DR.   BROWN'S   COMPANY   (2024),
https://www.drbrownsbaby.com/wp-content/uploads/2024/06/BFW001_F5_Universal_Bottle_
WEB _ADA.pdf.

[31] *Id.*

[32] Dunzhu Li et al., *Microplastic Release from the Degradation of Polypropylene Feeding Bottles
During Infant Formula Preparation*, 1 NATURE FOOD 746, 746 (Nov. 2020),
https://doi.org/10.1038/s43016-020-00171-y.

[33]   *Sterilizers   and   Warmers*,   https://www.drbrownsbaby.com/product-category/baby-
bottles/sterilizers-warmers/ (last accessed Oct. 2, 2024).

[34] *Dr. Brown's Bottle Sterilizer and Dryer*, https://www.drbrownsbaby.com/product/dr-browns-
bottle-sterilizer-and-dryer/ (last accessed Oct. 2, 2024).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

and Sterilizer,[35] and the Microwave Steam Sterilizer,[36] among other sterilization and warming products, expose the Products to heat.[37] By selling these warmers and sterilizers for use with the Products, Defendant intends and encourages consumers to expose the Products to heat through ordinary use. Exposing the Products to heat, however, causes them to release harmful microplastics, posing risk to children safety. Even if consumers do not use Defendant's warmer or sterilizer products with the Products, Defendant still intends for consumers to heat the Products by using boiling water to sterilize them before their first use and after each use.[38]

30.    **Consumers Heat the Products Through Ordinary Use.** Approximately 35% of parents use the microwave to prepare formula and 20% do so frequently; with 12% of parents reheating breastmilk in the same manner. Many also sterilize child feeding products like bottles and trainer cups by exposing them to heat, such as through boiling. However, heating or boiling plastic containers and bottles made of polypropylene, such as Defendant's Products, at higher temperatures causes more than a two-fold increase in the release of microplastics. Despite this, Defendant fails to warn consumers against heating their Products, which drastically increases microplastic exposure.

31.    **Heating Polypropylene Releases Harmful Microplastics.** Heating polypropylene releases 13.5% to 67.5% more microplastics into liquids at 140 degrees Fahrenheit than it does into liquids at 41 degrees.[39] The Products are made of polypropylene plastic and Defendant intends for them to be exposed to temperatures in excess of 140 degrees Fahrenheit as the Products' instructions direct consumers to sterilize the Products with steam and boiling water (water's boiling point is 212

---

[35] *Dr. Brown's Deluxe Bottle Warmer and Sterilizer*, https://www.drbrownsbaby.com/product/deluxe-bottle-warmer-sterilizer/ (last accessed Oct. 2, 2024).
[36] *Microwave Steam Sterilizer*, https://www.drbrownsbaby.com/product/dr-browns-baby-bottle-microwave-steam-sterilizer/ (last accessed Oct. 2, 2024).
[37] *Bottle Sterilizer and Dryer*, *supra* note 34 ("Steam and sterilize up to six bottles at once, plus bottle accessories, breast pump parts, pacifiers, teethers, and more"); *Deluxe Warmer and Sterilizer*, *supra* note 35 ("Quickly and safely warm bottles and food jars – and sanitize…"); *Microwave Steam Sterilizer, supra* note 36 ("The custom-molded bottle sterilizer can sterilize up to 4 Dr. Brown's baby bottles at once, plus bottle parts and additional accessories all at once.").
[38] *Bottle Instructions*, *supra* note 30.
[39] Guanyu Zhou et al., *How Many Microplastics do We Ingest When Using Disposable Drink Cups?*, 441 J. HAZARDOUS MATERIALS (Jan. 2023), at 5, https://doi.org/10.1016/j.jhazmat.2022.129982.

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

degrees Fahrenheit)[40] or to use the Dr. Brown's Natural Flow Deluxe Baby Bottle Sterilizer, which exposes the Products to heat of 212 degrees Fahrenheit through high-powered steam.[41] Products with polypropylene plastic composition, like the Products here, release microplastics through sterilization and cleaning, shaking with warm water, and other exposure to high temperature water during formula preparation procedures.[42] In fact, just a single preparation by heating and shaking of formula in a polypropylene feeding bottle can produce up to 16 million microplastic particles per liter; an amount astronomically higher than the estimated mean consumption of 100,000 particles per year in adults.[43] The amount of microplastics released increases with exposure to high water temperatures and sterilization.[44] Current research shows that toddlers consuming microwaved dairy products from polypropylene containers can intake up to 22.1 ng/kg day of microplastics every day.[45] A shocking study revealed that a single infant consuming formula from polypropylene bottles ingests between 14,600 and a staggering 4.55 million microplastic particles every single day.[46]That means that  the amount of microplastics infants are exposed to just from infant feeding bottles is approximately *2,600 times higher* than the total daily consumption of microplastics for adults from water, food, and air combined.[47] The intense heat used to sterilize the infant feeding bottles is thought to be a significant reason for the large amount of microplastics released from the infant feeding bottles.[48] The sheer volume of these plastic particles bombarding infants' developing bodies is alarming, highlighting an urgent need for action.

[40] *What is the Boiling Point of Water*, ASK USDA (Mar. 18, 2024) https://ask.usda.gov/s/article/What-is-the-boiling-point-of-water#:~:text=The%20boiling%20point%20of%20water%20is,F%20(100%20%C2%B0C).
[41] *Electric Sterilizer with LED (US Plug)*, DR. BROWN'S MEDICAL (2021), https://www.drbrownsmedical.com/wp-content/uploads/2016/08/SS_F1AC045-Electric-Sanitizer-with-LED_PROOF.pdf ("Steam temperature at 212 °F/100 °C").
[42] Li, *supra* note 17; Philipp Schwabb, *Microplastics in hot water*, Nature Food, doi:10.1038/s43016-020-00174-9.
[43] Li, *supra* note 17.
[44] *Id.*
[45] Kazi Albab Hussain et al., *Assessing the Release of Microplastics and Nanoplastics from Plastic Containers and Reusable Food Pouches: Implications for Human Health*, 57 ENV'T SCI. & TECH. 9782, 9782 (2023), https://pubmed.ncbi.nlm.nih.gov/37343248/.
[46] *Id.*
[47] Kate Blackburn & Danielle Green, *The potential effects of microplastics on human health: What is known and what is unknown. Ambio* 51, 518–530 (2022). https://doi.org/10.1007/s13280-021-01589-9.
[48] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

32.     **Defendant Fails to Inform Consumers How to Mitigate Microplastic Release.**
Defendant advises consumers to sterilize the Products by boiling them.[49] Additionally, many parents
sanitize baby feeding products via exposure to heat, such as by boiling the products.[50] The CDC
recommends that caretakers sterilize baby feeding equipment daily.[51] By using the Products under
normal conditions, consumers expose them to heat, yet Defendant fails to warn that this ordinary
use can cause the Products to leach microplastics. During a single boil, over 10 million
polypropylene microplastics per liter are released.[52] Even if the baby bottles are not heated with
milk in them, the heat for sterilization still causes the Products to release copious amounts of
microplastics. At least one study has shown that ingesting microplastics shed from polypropylene
baby bottles causes intestinal inflammation that is notably more intense when those microplastics
are released through disinfection via boiling or microwave heating.[53] Such inflammatory responses
can lead to diseases like cancer.[54] Defendant fails to inform consumers of these harms—misleading
consumers to believe the Products are safe to use as intended and do not jeopardize the safety of
children using the Products. Defendant further neglects to inform consumers of the necessary steps
to mitigate the associated microplastic release. Such mitigating steps include rinsing the Products
with cold water after heating them to reduce microplastic release, and to prevent these particles from

---

[49] *Bottle Instructions*, *supra* note 30; *Sippy Straw and Sippy Straw Bottles*, DR. BROWN'S MILESTONES (2021), https://www.drbrownsbaby.com/wp-content/uploads/2021/06/BFW013_F2_Sippy_Straw_Bottle_FINAL.pdf; *Dr. Brown's Natural Flow Anti-Colic Options+ Narrow Baby Bottle, with Level 1 Slow Flow Nipple*, https://www.drbrownsbaby.com/product/dr-browns-natural-flow-anti-colic-options-plus-narrow-baby-bottle-with-level-1-slow-flow-nipple/ (last accessed Oct. 2, 2024); *Dr. Brown's Natural Flow Anti-Colic Options+ Wide-Neck Baby Bottle, with Level 1 Slow Flow Nipple*, https://www.drbrownsbaby.com/product/options-plus-anti-colic-wide-neck-bottle/ (last accessed Oct. 2, 2024).
[50] Centers for Disease Control and Prevention, *How to Clean, Sanitize, and Store Infant Feeding Items* (Apr. 16, 2024), https://www.cdc.gov/hygiene/childcare/clean-sanitize.html.
[51] *How to Clean, Sanitize, and Store Infant Feeding Items*, *supra* note 50.
[52] Li, *supra* note 17 (also stating that this finding is in line with previous findings).
[53] Zhimin Xu et al., *Exposure to irregular microplastic shed from baby bottles activates the ROS/NLRP3/Caspase-1 signaling pathway, causing intestinal inflammation*, Environment International, https://pubmed.ncbi.nlm.nih.gov/37924603/.
[54] Sharon Adarlo, *Microplastics Likely Causing Wave of Cancer in Young People*, Futurism (Aug. 8, 2024), https://futurism.com/neoscope/microplastics-cancer-young-people; *see also* Shelley Li et al., *Could Microplastics Be a Driver for Early Onset Colorectal Cancer?*, 15(13) Cancers 3323 (June 24, 2023), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC10340669/ ("…microplastics may disrupt the colonic mucus layer, thus reducing its protective effect, and thus increasing the likelihood of colorectal cancer.").

FIRST AMENDED CLASS ACTION COMPLAINT

contaminating the food or drink inside.[55] Defendant deprived this information from consumers, leaving consumers without the knowledge of how to mitigate the danger of microplastics release. It also deprives consumers of making a different purchasing decision altogether—one that would not expose their babies and toddlers to an unreasonable and unnecessary safety hazard, in line with consumers' top purchase driver for baby products: harm and risk reduction.

33.   **The Products Pose an Unreasonable Safety Hazard**. The Products are infant feeding bottles made of polypropylene plastic, which pose the danger of leaching microplastics—especially when exposed to heat—and can cause severe health complications, such as negatively impacting the immune system, the digestive tract, and causing various types of cancer. This danger is exacerbated by the Products being exposed to heat, through ordinary use of the Products as directed and intended by Defendant without any warning whatsoever. The danger is further compounded by the daily, constant use of the Products as infants use the Products throughout the day and constantly have it near them and their mouths; this is especially concerning since microplastics bioaccumulate, thus making each exposure to microplastics increase the harm to one's health. Therefore, the Products pose the unreasonable safety hazard of leaching microplastics.

34.   **The Material Danger Negates the Products' Central Function.** The central function of the Products is to provide a safe means for delivering formula and other liquids to babies and young children. However, the Products are defective in fulfilling this function because they release harmful microplastics—a defect that compromises the Products' ability to perform its central function. Consumers expect that since the Products are intended for use by babies and infants to feed and drink from, that the Products will serve that function safely, without exposing children to dangers such as the Material Danger (exposure to harmful microplastics). Consumers consider the safety of the Products to be material and central to the Products' function.[56] Indeed, consumers do not desire to purchase feeding device products that expose vulnerable children to dangers such as

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

---

[55] Li, *supra* note 17.
[56] Mass Market Retailers, *Safety a Top Priority for Baby Product Purchases*, (July 8, 2024), http://digitaledition.massmarketretailers.com/publication/?i=825735&article_id=4808633&view=articleBrowser.

FIRST AMENDED CLASS ACTION COMPLAINT

exposure to microplastics.[57] As such, the Material Danger affects an important and central function of the Products of providing a safe feeding device for children that renders the Product incapable of use by consumers.

C.   **The Material Omission Misleads Reasonable Consumers About the Products' Safety and Conceals the Presence of Harmful Microplastics**

35.   Defendant materially omits that the Products pose the danger of leaching microplastics, which causes detrimental long-term harm to children. Consumers expect manufacturers to disclose dangers associated with their products. This is especially true for manufacturers of baby products as these products are intended for society's most vulnerable population and therefore consumers expect a heightened degree of safety for such products. The Material Omission conveys to consumers that the Products do not pose the Material Danger—*i.e.*, that the Products leach microplastics that cause long-term harm to children. Defendant fails to live up to the reasonable consumer's expectations of the Products because the Products, upon heating them through ordinary use, leach microplastics into the bottle's contents, contaminating the food babies and infants consume. Reasonable consumers are therefore misled by Defendant through its use of the Material Omission into believing the Products are safe and do not pose the Material Danger. A study published after the filing of the original complaint tested consumers' willingness to pay for products that did and did not inform consumers about the product packaging's potential for microplastics harm.[58] The study concluded that consumers greatly valued product labels that informed them of the potential for microplastics harm.[59]

D.   **The "BPA FREE" Claim Lulls Consumers Into a False Sense of Security that Further Hides the Material Omission**

36.   Defendant fails to disclose the risk of the Material Danger and represents that the Products are "BPA FREE" on the front labels of its Products. "BPA" stands for Bisphenol A. BPA

---

[57] Adrienne Matei, *Tiny plastic, huge risk: As an expert on microplastics, here's what I do to keep my family safe*, BUSINESS INSIDER (January 25, 2023), https://www.businessinsider.com/expert-how-i-keep-baby-family-safe-toxic-plastic-microplastics-2023-1.
[58] László Bendegúz Nagy et al., *Nudging consumers about the issue of microplastics: an experimental auction study on valuation for sustainable food packaging*, 14 Scientific Reports (Aug. 16, 2024), https://www.nature.com/articles/s41598-024-69962-8.
[59] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

is a chemical used in manufacturing polycarbonate plastics that leaches into food and beverages. BPA causes negative health effects on the reproductive system, child development, metabolic disorders, obesity, endocrine disorders, and the nervous system.[60] BPA can also damage DNA, cause oxidative stress, and promote certain breast cancers.[61] Even if the "BPA FREE" claim is purportedly technically accurate, in tandem with the Material Omission, it further lulls consumers into a false sense of security and reasonable belief that the Products contain no harmful plastic byproducts and do not leach any. When combined with the Material Omission, the "BPA FREE" claim further reinforces consumers' reasonable belief that the Products are safe and free from harmful plastics. A study of consumer behavior found that "BPA FREE" labels "are misleading, and are likely to cause some people to accept substitute chemicals that they might otherwise reject."[62] Indicating that a "product [is] free of a particular chemical leads to a lack of consideration over the risks potentially presented by substitute materials."[63] In this case, it works to further hide the Material Omission from customers.

37.     **FTC Green Guides**. Recognizing the problem of misleading and deceptive claims, the United States Federal Trade Commission created the "Green Guides" to help companies, like Defendant, avoid making such claims.[64] The Green Guides, and the examples contained therein, "provide the Commission's views on how reasonable consumers likely interpret certain claims."[65]

38.     The Green Guides specifically address the use of "free-of" claims, stating that "[i]t is deceptive to misrepresent, directly or by implication, that a product, package, or service is free of, or does not contain or use, a substance. Such claims should be clearly and prominently qualified to the extent necessary to avoid deception."[66]

---

[60] *Bisphenol A (BPA) Factsheet*, *supra* note 1; M. Thoene, *supra* note 1.
[61] *Id.*
[62] Andrew Maynard, *New study shows "BPA-free" labels may increase risky behavior*, 2020 SCIENCE ARCHIVE (Dec. 1, 2014), https://2020science.org/2014/12/01/new-study-shows-bpa-free-labels-may-increase-risky-behavior/.
[63] *Id.*
[64] *See generally* 16 C.F.R. § 260 ("Guides for the Use of Environmental Marketing Claims").
[65] *Id.* at § 260.1(d) (emphasis added).  *See also* FTC*, The Green Guides: Statement of Basis and Purpose* (last revised 2012), at 1, https://www.ftc.gov/sites/default/files/attachments/press-releases/ftc-issues-revised-green-guides/greenguidesstatement.pdf ("The Guides explain how reasonable consumers likely interpret each such claim, describe the basic elements necessary to substantiate it, and present options for qualifying to avoid deception.").
[66] 16 C.F.R. § 260.9(a).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

39.   Moreover, the Green Guides provide:

**A truthful claim that a product, package, or service is free of, or does not contain or use, a substance may nevertheless be deceptive if: (1) The product, package, or service contains or uses substances that pose the same or similar environmental risks** as the substance that is not present; or (2) The substance has not been associated with the product category.[67]

40.   The Green Guides also provide an example of how a "free-of" claim would be interpreted by reasonable consumers:

A package of t-shirts is labeled "Shirts made with a chlorine-free bleaching process." The shirts, however, are bleached with a process that releases a reduced, but still significant, amount of the same harmful byproducts associated with chlorine bleaching. The claim overstates the product's benefits because reasonable consumers likely would interpret it to mean that the product's manufacture does not cause any of the environmental risks posed by chlorine bleaching.[68]

41.   **Microplastics Pose Similar Risks to BPA.** The Products' "BPA FREE" claim further hides the Material Omission from detection by consumers because it leads reasonable consumers to believe, as provided by the Green Guides, that the Products are not only free from BPA and its associated dangers, but also free of any harms similar to those posed by BPA.[69] The Products pose similar dangers to those associated with BPA because microplastics from polypropylene bottles, like BPA-related chemicals, leach harmful substances when heated, resulting in comparable health risks to the digestive, immune, and reproductive systems.[70] Defendant's Material Omission, further hidden as a result of the affirmative "BPA FREE" claim, misleads consumers about the safety of its Products. This deception has allowed Defendant to boost its profits at the expense of consumers' trust and the health of infants and young children.

E.   **Plaintiffs and Reasonable Consumers Were Misled by the Material Omission and Representation into Buying the Products**

42.   **Products.** Defendant manufactures, markets, promotes, advertises, labels, packages, and sells the Products, each of which materially omits the Material Danger from the Products' front-facing labels and packaging.

[67] *Id.* at § 260.9(b).
[68] *Id.* at § 260.9 (example 1).
[69] *See id.* at § 260.9(b).
[70] Yarenis Chinchilla et al., *Human Health Risk Assessment for Consumption of Microplastics and Plasticizing Substances Through Marine Species*, 237(Pt 1) Environ. Res. 116843, 116844 (2023).

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

43.   **The Material Omission and Representation.** On the Products' labeling and packaging, Defendant affirmatively represents on the Products' labels that they are "BPA FREE" claim yet omits material information that the Products pose a similar risk to BPA by leaking dangerous microplastics through ordinary use.

44.   **Reasonable Consumer's Perception.** The Material Omission and representations lead reasonable consumers, like Plaintiffs, into believing that the Products are safe—meaning, consumers are led to believe that the Products are a safer choice for feeding babies and young children that do not pose the risk of the Material Danger.

45.   **Materiality.** The Material Omission is material to reasonable consumers, including Plaintiffs, in deciding to buy the Products because reasonable consumers value information relating to the Products' safety. This is especially true when it concerns using the Products in their intended and ordinary way that results in harmful plastics being consumed by babies—meaning that it is important to consumers that the Products are safe and motivates them to buy the Products. For new parents, safety is "overwhelmingly the top factor in purchasing baby products amongst all parents surveyed, followed by health and cost."[71] New mothers in particular value safety, healthiness, and quality of their baby products most of all.[72]

   a.   Studies demonstrate the omnipresence of microplastics in the environment and those linking microplastics to negative health outcomes in humans. Children face a world of dangers and parents want to avoid and lessen their children's exposure to them wherever they can. The ever-growing presence of microplastic pollution throughout the world spurs parents' efforts to try to mitigate additional exposure for their children.[73] Consumers are not the only ones who are rightfully wary of exposure to

---

[71] *New Parent Purchasing Behavior: Insights from more than 6,500 new and expecting parents in the U.S.*, Healthline Media (2020), https://healthlinemedia.com/assets/files/Healthline-Parenthood-Report-Part-2-New-Parent-Purchasing-Behavior-(2).pdf.

[72] Jane Boutelle, *What Attracts New Moms to Baby Brands*, Digsite, https://www.digsite.com/hubfs/Research%20Reports/What%20Attracts%20Moms%20to%20Baby%20Brands.pdf.

[73] User Karma_collection_bin, REDDIT (July 25, 2023, 1:49 PM), https://tinyurl.com/2s444rud ("Yea but we can reduce our bodies' overall concentration/exposure levels [to microplastics] just like with other things (e.g. carcinogens, toxins, alcohol, mercury, pick your 'poison'). That seems worthwhile to me."); User ditchdiggergirl, REDDIT (Oct. 15, 2021, 8:55 AM), https://tinyurl.com/5cdu6d9c ("[Microplastic exposure] doesn't have to get to zero to be worthwhile. . . .there's still a huge benefit from reducing exposure from high to medium, or medium to low."); User Elliedee3, *Emulait glass bottles. No lead or plastic*, BABYCENTER (July 14, 2024), https://community.babycenter.com/post/a78452843/emulait-glass-bottles-no-lead-or-plastic ("I know plenty of plastics as I work in an endocrine lab I just try my best to minimize it where I can control it.").

FIRST AMENDED CLASS ACTION COMPLAINT

microplastics. Doctors, specialists, and researchers have all begun recommending that consumers avoid exposure to microplastics in light of the recent explosion of studies demonstrating their harmful effects on human health.[74]

b. Public reaction since the filing of Plaintiffs' original complaint further confirms the materiality of Defendant's omission for reasonable consumers. Users across various online forums for new parents have expressed outrage and concern over Defendant's Material Omission, leading many to switch to non-plastic alternatives such as glass bottles.[75]

46.     **Reliance.** The Class, including Plaintiffs, reasonably relied on the Material Omission in deciding to purchase the Products.

47.     **Falsity.** The Material Omission is deceptive because the Products leach microplastics into milk and formula during ordinary use.

48.     **Consumers Lack Knowledge of Falsity.** When purchasing the Products, the Class members, including Plaintiffs, were unaware and had no reason to believe that the Material Omission was misleading, deceptive, and unlawful. The Products' labeling and packaging led consumers to believe that the Products were free from harmful plastic exposure. The Products did not contain a clear, unambiguous, and conspicuously displayed statement informing reasonable consumers that the Products posed the risk of the Material Danger. Even if Defendant had included inconspicuous fine print or other statements and disclaimers on other portions of the Products' packaging, studies show that only 7.7% to 11.6% of people look at a consumer product's side or

---

[74] Laura López González, *I'm a Microplastics Researcher. Here's How To Limit Their Dangers*, UNIVERSITY OF CALIFORNIA, SAN FRANCISCO (Feb. 27, 2024), https://www.ucsf.edu/news/2024/02/427161/how-to-limit-microplastics-dangers; Sara Berg, MS, *What doctors wish patients knew about microplastics*, AMA (Sept. 20, 2024), https://www.ama-assn.org/delivering-care/public-health/what-doctors-wish-patients-knew-about-microplastics; David S. Chang, *Doctor's Note: Life in Plastic, It's Not Fantastic – Microplastic and Nanoplastic Toxicity*, SATURDAY EVENING POST (June 5, 2024), https://www.saturdayeveningpost.com/2024/06/doctors-note-life-in-plastic-its-not-fantastic-microplastic-and-nanoplastic-toxicity/.

[75] User Baby211724, *Microplastics in plastic bottles- FYI Phillips and Dr. Browns*, WHAT TO EXPECT (July 7, 2024, 8:16 AM), https://community.whattoexpect.com/forums/january-2024-babies/topic/microplastics-in-plastic-bottles-fyi-phillips-and-dr-browns-163131543.html ("I'm so mad that these companies have zero regard or care for the babies and families they are supposed to help. We are switching to glass bottles…"); User Juliamacey12, *Alternatives for Dr brown/Philip avent bottles*, BABYCENTER (July 6, 2024), https://community.babycenter.com/post/a78447913/alternatives-for-dr-brownphilip-avent-bottles ("Also I do know we can not protect baby from everything but for me being able to make a small switch is worth it.").

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

back labels before making a purchase.[76] Therefore, qualifying statements or contradictory disclaimers on back or side panels, such as a notice that the Products are made from polypropylene, are not sufficiently conspicuous to presume that a reasonable consumer would have noticed or understood them to qualify or contradict the prominently placed front-panel representations.

49.   **Defendant's Knowledge.** Defendant knew, or should have known, that the Material Omission is misleading, deceptive, and unlawful, at the time that Defendant manufactured, marketed, advertised, labeled, and sold the Products.

    a.   **Knowledge of Reasonable Consumers' Perception.** Defendant knew or should have known that the Material Omission would lead reasonable consumers into believing that the Products would not expose their infants and young children to harmful microplastics. Not only has Defendant utilized a long-standing brand strategy to identify the Products as safe, but Defendant also has an obligation under section 5 of the Federal Trade Commission Act, codified at 15 U.S.C. §§ 45, to evaluate its marketing claims from the perspective of the reasonable consumer. That means Defendant was statutorily obligated to consider whether the Material Omission, be it in isolation or conjunction with its marketing strategy, would mislead reasonable consumers into believing that the Products are free from harmful microplastic exposure. Thus, Defendant either knew that the Material Omission is misleading before it marketed the Products to the Class, including

---

[76] Klaus G. Grunert et. al, *Nutrition Knowledge, and Use and Understanding of Nutrition Information on Food Labels Among Consumers in the UK*, 55 APPETITE 177, 179–181 (May 2010), https://pubmed.ncbi.nlm.nih.gov/20546813/ (consumer purchasing behavior study using in-store observation and interview data collection methodology to realistically estimate the degree consumers use nutritional information (found on side/back panels of food product labels and packaging), finding: (1) only **11.6% of respondents**, who looked at a product and placed it in their shopping cart, **were actually observed looking at the side/back panels of its packaging or labels** (panels other than the front panel) before placing it in the cart; (2) of those who looked at the side/back panels, only 31.8% looked at it the product "in detail" (i.e., 3.7% of respondents who looked at the product, looked at side/back panels in detail); and (3) the **respondents self-reported frequency of reviewing side/back panels** (for nutritional information) **is overreported by 50%** when the in-store interview data and observational data are compared). *See also* Klaus G. Grunert et. al, *Use and Understanding of Nutrition Information on Food Labels in Six European Countries*, 18 J. PUB. HEALTH 261, 261, 263, 266 (Jan. 2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2967247/ (consumer purchasing behavior study using in-store observation and interview data collection methodology to evaluate whether people look at food labels before buying them, where they looked, and how long they looked, finding: (1) respondents spent, on average, approximately 35 seconds, per product, on products they bought; and (2) 62.6% of respondents looked at the front packaging, and **only 7.7% looked elsewhere (side/back panels) on the packaging**, for products they bought. *See also* Yael Benn et al., *What Information do Consumers Consider, and How Do They Look for It, When Shopping for Groceries Online?*, 89 APPETITE 265, 265, 270 (June 2015), https://doi.org/10.1016/j.appet.2015.01.025 (consumer purchasing behavior study using online eye-movement tracking and recordation, finding: (1) once on the product webpages, respondents tend to look at the pictures of products, rather than examine detailed product information; and (2) by comparison to pictures of products where 13.83% to 19.07% of respondents fixated far less fixated on subsidiary information: 4.17% of respondents looked at nutrition information, 3.30% looked at ingredients, 2.97% examined allergy information, and 0.09% examined recycling information).

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Plaintiffs, or Defendant would have known that that it was deceptive had it complied with its statutory obligations.

b. **Knowledge of Falsity.** Defendant manufactured and marketed the Products with the Material Omission, despite the fact that the Products do not conform to these representations. Specifically, Defendant advertised, labeled, and packaged the Products with the Material Omission, while choosing not to inform consumers that the Products release microplastics when exposed to heat. This suggests that Defendant either knew that the Products could not live up to the promises made in their marketing and labeling, or that Defendant would have known about the Products' inability to perform as advertised had it complied with its statutory obligation to evaluate marketing claims from the perspective of a reasonable consumer.

c. **Exclusive Knowledge.** Defendant is in a superior position to Plaintiffs and the Class to know about the Products' Material Danger. As the manufacturer of the Products, Defendant is in the best position to know of any dangers associated with the Products, including the presence of the Material Danger. Defendant's control of the manufacturing, design, distribution, and safety testing of the Products gives Defendant exclusive knowledge of the presence of the Material Danger. Defendant purposely retains this exclusive knowledge by neither informing consumers of the plastic the Products are made of much less the Material Danger posed by the Products. Instead, it makes an affirmative representation as to the unidentified plastic ("BPA FREE") that further conceals the Material Danger which is substantially similar to that posed by BPA.

d. **Knowledge of Materiality.** Defendant knew or should have known of the Material Omission's materiality to consumers. ***First***, manufacturers and marketers, like Defendant, know safety is of paramount concern for consumers of baby and infant products. Here, the Material Omission relates directly to the Products' safety. ***Second,*** Defendant's awareness of the importance of the Products' safety, specifically safety related to harmful plastics, is reflected by its "BPA FREE" representation on the Products' front labels and packaging that is consistent throughout all Product packaging and labeling. ***Third***, it is common sense that information concerning the risk of the Material Danger—*i.e.*, the safety of the Products—is material to consumers as Defendant should have known that the risk of health complications from using the Products would affect whether consumers purchased the Products. Thus, Defendant knew, in designing the Products, that the Material Omission was material to consumers.

e. **Defendant's Continued Deception, Despite Its Knowledge.** As the manufacturer and marketer of the Products, Defendant had exclusive control over the omission of the Material Danger on the Products' labels, packaging, and advertisements. Defendant could have easily disclosed the Material Dangers or rectified consumers' misplaced beliefs by informing them about leaching of microplastics. However, despite Defendant's knowledge of the falsity of the Material Omission, and its awareness that consumers reasonably rely on these representations and omissions when deciding to purchase the Products, Defendant deliberately chose to market the Products with the misleading Material Omission. This decision led consumers to buy or overpay for the Products, believing they possessed attributes that Defendant falsely advertised and warranted. Therefore, Defendant knew or should have known, at all relevant times, that the Material Omission would mislead reasonable consumers, such as Plaintiffs, into purchasing the Products to obtain the product attributes that Defendant deceptively portrayed.

50. **Duty to Disclose Material Omission.** Defendant had an obligation, at all relevant

times, to disclose the Material Omission—that the Products leach harmful microplastics into milk or formula during ordinary use. This crucial information, which Defendant deliberately withheld from consumers, is not only material to their purchasing decisions but also has far-reaching consequences for the health and well-being of infants and young children. Defendant knew or should have known that reasonable consumers would perceive the Products and the absence of the Material Omission to mean that the Products were free from harmful plastics. It was also fully aware that this attribute was a key factor influencing consumers' choices, causing them to rely on the absence of the Material Omission when deciding to purchase the Products.

51.     **Detriment.** Plaintiffs and similarly situated consumers would not have purchased the Products or would not have overpaid a price premium for them, if they had known that the Products posed the Material Danger and, therefore, that the Products do not have the attribute claimed, promised, warranted, advertised, and/or represented. Accordingly, based on Defendant's Material Omission, reasonable consumers, including Plaintiff, purchased the Products to their detriment.

**F.     The Products are Substantially Similar**

52.     As described herein, Plaintiffs purchased the Purchased Product. The additional Products identified *supra* (collectively, the "**Unpurchased Products**") are substantially similar to the Purchased Product.

> a.  **Defendant.** All Products are manufactured, sold, marketed, advertised, labeled, and packaged by Defendant.
>
> b.  **Brand.** All Products are sold under the same brand name: Dr. Brown's.
>
> c.  **Marketing Demographics.** All Products are marketed directly to consumers for personal use.
>
> d.  **Purpose.** All Products are bottles designed and marketed as suitable for heating formula or breastmilk via the microwave or warm water; sterilization through boiling or appliances such as Defendant's Dr. Brown's sterilizers; and/or cleaning through the dishwasher.
>
> e.  **Use.** All Products are used in the same manner—heating formula or breastmilk via the microwave or warm water; sterilization through boiling or appliances such as Defendant's Dr. Brown's sterilizers; and cleaning through the dishwasher.
>
> f.  **Material Omission and Representations.** All Products contain the Material Omission and "BPA FREE" representation on their packaging and labeling.
>
> g.  **Packaging.** All Products are similarly packaged.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

h. **Key Attributes.** Whether via warm water, microwave, or other heating mechanism, heating Defendant's plastic bottles releases a significant amount of microplastics into milk or formula. Defendant intends for its trainer cups and spout cups to be sterilized in the same manner and sells the tools to do so.

i. **Misleading Effect.** The misleading effect of the Material Omission on consumers is the same for all Products—consumers over-pay for baby bottles and cups they believe to be suitable for feeding babies and young children.

## G. No Adequate Remedy at Law

53. **No Adequate Remedy at Law.** Plaintiffs and members of the Class are entitled to equitable relief as no adequate remedy at law exists.

a. **Broader Statutes of Limitations.** The statutes of limitations for the causes of action pled herein vary. The limitations period is four years for claims brought under the UCL, which is one year longer than the statutes of limitation under the FAL and CLRA. In addition, the statutes of limitation vary for certain states' laws for breach of warranty and unjust enrichment/restitution, between approximately 2 and 6 years. Thus, California Subclass members who purchased the Products more than 3 years prior to the filing of the complaint will be barred from recovery if equitable relief were not permitted under the UCL. Similarly, Nationwide Class members who purchased the Products prior to the furthest reach-back under the statute of limitations for breach of warranty, will be barred from recovery if equitable relief were not permitted for restitution/unjust enrichment.

b. **Broader Scope of Conduct.** In addition, the scope of actionable misconduct under the unfair prong of the UCL is broader than the other causes of action asserted herein. It includes, for example, Defendant's overall unfair marketing scheme to promote and brand the Products with the Material Omission, across a multitude of media platforms, including the Products' labels and packaging, over a long period of time, in order to gain an unfair advantage over competitor products and to take advantage of consumers' desire for products that comport with the Material Omission. The UCL also creates a cause of action for violations of law (such as statutory or regulatory requirements and court orders related to similar representations and omissions made on the type of products at issue). Thus, Plaintiffs and Class members may be entitled to restitution under the UCL, while not entitled to damages under other causes of action asserted herein (*e.g.*, the FAL requires actual or constructive knowledge of the falsity; the CLRA is limited to certain types of plaintiffs (an individual who seeks or acquires, by purchase or lease, any goods or services for personal, family, or household purposes) and other statutorily enumerated conduct). Similarly, unjust enrichment/restitution is broader than breach of warranty. For example, in some states, breach of warranty may require privity of contract or pre-lawsuit notice, which are not typically required to establish unjust enrichment/restitution. Thus, Plaintiffs and Class members may be entitled to recover under unjust enrichment/restitution, while not entitled to damages under breach of warranty, because they purchased the products from third-party retailers or did not provide adequate notice of a breach prior to the commencement of this action.

c. **Injunctive Relief to Cease Misconduct and Dispel Misperception.** Injunctive relief is appropriate on behalf of Plaintiffs and members of the Class because Defendant continues to misrepresent the Products with the Material Omission.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Injunctive relief is necessary to prevent Defendant from continuing to engage in the unfair, fraudulent, and/or unlawful conduct described herein and to prevent future harm—none of which can be achieved through available legal remedies (such as monetary damages to compensate past harm). Further, injunctive relief, in the form of affirmative disclosures is necessary to dispel the public misperception about the Products that has resulted from years of Defendant's unfair, fraudulent, and unlawful marketing efforts. Such disclosures would include, but are not limited to, publicly disseminated statements providing accurate information about the Products' true nature; and/or requiring prominent qualifications and/or disclaimers on the Products' front labels concerning the Products' true nature. An injunction requiring affirmative disclosures to dispel the public's misperception and prevent the ongoing deception and repeat purchases based thereon, is also not available through a legal remedy (such as monetary damages). In addition, Plaintiffs are *currently* unable to accurately quantify the damages caused by Defendant's future harm, because discovery and Plaintiffs' investigation is not yet completed, rendering injunctive relief all the more necessary. For example, because the Court has not yet certified any class, the following remains unknown: the scope of the class, the identities of its members, their respective purchasing practices, prices of past/future Product sales, and quantities of past/future Product sales.

d. **Public Injunction.** Further, because a "public injunction" is available under the UCL, damages will not adequately "benefit the general public" in a manner equivalent to an injunction.

e. **California vs. Nationwide Class Claims**. Violations of the UCL, FAL, and CLRA are claims asserted on behalf of Plaintiffs and the California Subclass against Defendant, while breach of warranty and unjust enrichment/restitution are asserted on behalf of Plaintiffs and the Nationwide Class. Dismissal of farther-reaching claims, such as restitution, would bar recovery for non-California members of the Class. In other words, legal remedies available or adequate under the California-specific causes of action (such as the UCL, FAL, and CLRA) have no impact on this Court's jurisdiction to award equitable relief under the remaining causes of action asserted on behalf of non-California putative class members.

f. **Procedural Posture—Incomplete Discovery & Pre-Certification.** In addition, discovery—which has not yet been provided and/or completed—may reveal that the claims providing legal remedies are inadequate. At this time, forcing an election of remedies at the initial pleadings stage, in the absence of completed discovery regarding class certification and merits, is premature and likely to lead to subsequent, potentially belated, and hotly contested motions to amend the pleadings to add equitable remedies based on a lengthy historical recount of discovery and analysis of voluminous exhibits, transcripts, discovery responses, document productions, etc., as well as related motions to seal confidential information contained therein.

## VI.    CLASS ACTION ALLEGATIONS

54.    **Class Definition.** Plaintiffs bring this action as a class action on behalf of themselves and all others similarly situated as members of the Class defined as follows:

All residents of the United States who, within the applicable statute of limitations periods, purchased the Products, containing the Material

Omission on the Products' labels or packaging, for purposes other than resale ("**Nationwide Class**"); and

All residents of California who, within four years prior to the filing of this action, purchased the Products, containing the Material Omission on the Products' labels or packaging, for purposes other than resale ("**California Subclass**").

(the "Nationwide Class" and "California Subclass" are collectively referred to as the "**Class**").

55.     **Class Definition Exclusions.** Excluded from the Class are: (i) Defendant, its assigns, successors, and legal representatives; (ii) any entities in which Defendant has controlling interests; (iii) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and (iv) any judicial officer presiding over this matter and person within the third degree of consanguinity to such judicial officer.

56.     **Reservation of Rights to Amend the Class Definition.** Plaintiffs reserve the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

57.     **Numerosity.** Members of the Class are so numerous that joinder of all members is impracticable. Upon information and belief, the Nationwide Class consists of tens of thousands of purchasers (if not more) dispersed throughout the United States, and the California Subclass likewise consists of thousands of purchasers (if not more) dispersed throughout the state of California. Accordingly, it would be impracticable to join all members of the Class before the Court.

58.     **Common Questions Predominate.** There are numerous and substantial questions of law or fact common to all members of the Class that predominate over any individual issues. Included within the common questions of law or fact are:

a.    Whether Defendant engaged in unlawful, unfair, or deceptive business practices by advertising and selling the Products;

b.    Whether Defendant's conduct of advertising and selling the Products as safe bottles while omitting that they leach microplastics into milk or formula during ordinary use constitutes an unfair method of competition, or unfair or deceptive act or practice, in violation of Civil Code section 1750, *et seq.*;

c.    Whether Defendant used deceptive representations or omission in connection with the sale of the Products in violation of Civil Code section 1750, *et seq.*;

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

d.  Whether Defendant represented that the Products have characteristics or quantities that they do not have in violation of Civil Code section 1750, *et seq*.;

e.  Whether Defendant advertised the Products with intent not to sell them as advertised in violation of Civil Code section 1750, *et seq*.;

f.  Whether Defendant's labeling and advertising of the Products are misleading in violation of Business and Professions Code section 17500, *et seq*.;

g.  Whether Defendant knew or by the exercise of reasonable care should have known its labeling and advertising was and is misleading in violation of Business and Professions Code section 17500, *et seq*.;

h.  Whether Defendant's conduct is an unfair business practice within the meaning of Business and Professions Code section 17200, *et seq*.;

i.  Whether Defendant's conduct is a fraudulent business practice within the meaning of Business and Professions Code section 17200, *et seq*.;

j.  Whether Defendant's conduct is an unlawful business practice within the meaning of Business and Professions Code section 17200, *et seq*.;

k.  Whether Plaintiffs and the Class paid more money for the Products than they actually received;

l.  How much more money Plaintiffs and the Class paid for the Products than they actually received;

m.  Whether Defendant's conduct constitutes breach of warranty;

n.  Whether Plaintiffs and the Class are entitled to injunctive relief; and

o.  Whether Defendant was unjustly enriched by its unlawful conduct.

59.  **Predominance**. The common questions of law and fact predominate over questions that affect only individual Class Members.

60.  **Typicality.** Plaintiffs' claims are typical of the claims of the Class Members they seek to represent because Plaintiffs, like the Class Members purchased Defendant's misleading and deceptive Products. Defendant's unlawful, unfair and/or fraudulent actions concern the same business practices described herein irrespective of where they occurred or were experienced. Plaintiffs and the Class sustained similar injuries arising out of Defendant's conduct. Plaintiffs' and Class Members' claims arise from the same practices and course of conduct and are based on the same legal theories.

61.  **Adequacy.** Plaintiffs are adequate representatives of the Class they seek to represent because their interests do not conflict with the interests of the Class Members. Plaintiffs will fairly

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

and adequately protect Class Members' interests and have retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that arise in consumer protection litigation.

62. **Ascertainability.** Class Members can easily be identified by an examination and analysis of the business records regularly maintained by Defendant, among other records within Defendant's possession, custody, or control. Additionally, further Class Member data can be obtained through additional third-party retailers who retain customer records and order histories.

63. **Superiority and Substantial Benefit.** A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all members of the Class is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

    a.  The claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting any individual member of the Class;

    b.  Absent a Class, the members of the Class will continue to suffer damage and Defendant's unlawful conduct will continue without remedy while Defendant profits from and enjoys its ill-gotten gains;

    c.  Given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendant committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

    d.  When the liability of Defendant has been adjudicated, claims of all members of the Class can be administered efficiently and/or determined uniformly by the Court; and

    e.  This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiffs and Class Members can seek redress for the harm caused to them by Defendant.

64. **Inconsistent Rulings.** Because Plaintiffs seek relief for all members of the Class, the prosecution of separate actions by individual members would create a risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendant.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

FIRST AMENDED CLASS ACTION COMPLAINT

65.   **Injunctive/Declaratory Relief.** The prerequisites to maintaining a class action for injunctive or equitable relief are met as Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or declaratory relief with respect to the Class as a whole.

66.   **Manageability.** Plaintiffs and their counsel are unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

**VII.   CAUSES OF ACTION**

**COUNT ONE**

**Violation of California Unfair Competition Law**

**(Cal. Bus. & Prof. Code §§ 17200,** *et seq.***)**

**(*On Behalf of the California Subclass*)**

67.   **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

68.   **California Subclass.** This cause of action is brought pursuant to Business and Professions Code Section 17200, *et seq.*, on behalf of Plaintiffs and a California Subclass who purchased the Products within the applicable statute of limitations.

69.   **The UCL.** California Business & Professions Code, sections 17200, *et seq.* (the "**UCL**") prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."

70.   **False Advertising Claims.** Defendant, in its advertising and packaging of the Products, made misleading statements and fraudulent omissions regarding the quality and characteristics of the Products—specifically, the Material Omission—despite the fact that the Products are not safe because they leach microplastics when used as intended. Such claims and omission appear on the label and packaging of the Products, which are sold at retail stores and point-of-purchase displays, as well as Defendant's official website, and other retailers' advertisements that have adopted Defendant's advertisements.

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

71.     **Defendant's Deliberately Fraudulent Marketing Scheme.** Defendant does not have any reasonable basis for the claims about the Products made in Defendant's advertising and on Defendant's packaging or labeling because the Products are not safe for infants and young children. Defendant knew and knows that the Products are not free from plastic exposure because they leach microplastics into the milk or formula during ordinary use, though Defendant intentionally advertised and marketed the Products to deceive reasonable consumers into believing that the Products are safe.

72.     **Exclusive Knowledge.** Defendant has exclusive knowledge of the Products' danger to leach microplastics. Defendant, as the manufacturer of the Products, is in a superior knowledge position to consumers, including Plaintiffs, to know about the microplastics danger. Defendant's control of the manufacturing, design, distribution, and safety testing of the Products gives Defendant exclusive knowledge of the presence of the Material Danger.

73.     **Misleading Advertising Claims Cause Purchase of Products.** Defendant's labeling and advertising of the Products led to, and continues to lead to, reasonable consumers, including Plaintiffs, believing that the Products are a safe feeding solution for their children.

74.     **Injury in Fact.** Plaintiffs and the California Subclass have suffered injury in fact and have lost money or property as a result of and in reliance upon the Material Omission—namely, Plaintiffs and the California Subclass lost the purchase price for the Products they bought from Defendant.

75.     **Conduct Violates the UCL.** Defendant's conduct, as alleged herein, constitutes unfair, unlawful, and fraudulent business practices pursuant to the UCL. The UCL prohibits unfair competition and provides, in pertinent part, that "unfair competition shall mean and include unlawful, unfair or fraudulent business practices and unfair, deceptive, untrue or misleading advertising."  Cal. Bus & Prof. Code § 17200. In addition, Defendant's use of various forms of advertising media to advertise, call attention to, or give publicity to the sale of goods or merchandise that are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading advertising, and an unlawful business practice within the meaning of Business and Professions Code Sections 17200 and 17531, which advertisements have deceived and are likely to

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1  deceive the consuming public, in violation of Business and Professions Code Section 17200.

2  76. **No Reasonably Available Alternatives/Legitimate Business Interests.** Defendant

3  failed to avail itself of reasonably available, lawful alternatives to further its legitimate business

4  interests.

5  77. **Business Practice.** All of the conduct alleged herein occurred and continues to occur

6  in Defendant's business. Defendant's wrongful conduct is part of a pattern, practice and/or

7  generalized course of conduct, which will continue on a daily basis until Defendant voluntarily

8  alters its conduct or Defendant is otherwise ordered to do so.

9  78. **Injunction.** Pursuant to Business and Professions Code Sections 17203 and 17535,

10  Plaintiffs and the members of the California Subclass seek an order of this Court enjoining

11  Defendant from continuing to engage, use, or employ its practice of labeling and advertising the

12  sale and use of the Products. Likewise, Plaintiffs and the members of the California Subclass seek

13  an order requiring Defendant to disclose such misrepresentations, and to preclude Defendant's

14  failure to disclose the existence and significance of said misrepresentations.

15  79. **Causation/Damages.** As a direct and proximate result of Defendant's misconduct in

16  violation of the UCL, Plaintiffs and members of the California Subclass were harmed in the amount

17  of the purchase price they paid for the Products. Further, Plaintiffs and members of the California

18  Subclass have suffered and continue to suffer economic losses and other damages including, but not

19  limited to, the amounts paid for the Products, and any interest that would have accrued on those

20  monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for

21  violation of the UCL in damages, restitution, and/or disgorgement of ill-gotten gains to compensate

22  Plaintiffs and the California Subclass for said monies, as well as injunctive relief to enjoin

23  Defendant's misconduct to prevent ongoing and future harm that will result.

24  *"Unfair" Prong*

25  80. **Unfair Standard.** Under the UCL, a challenged activity is "unfair" when "any injury

26  it causes outweighs any benefits provided to consumers and the injury is one that the consumers

27  themselves could not reasonably avoid." *Camacho v. Auto Club of Southern California*, 142 Cal.

28  App. 4th 1394, 1403 (2006).

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

FIRST AMENDED CLASS ACTION COMPLAINT

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

81. **Injury.** Defendant's action of mislabeling the Products with the Material Omission does not confer any benefit to consumers; rather, doing so causes injuries to consumers, who do not receive products commensurate with their reasonable expectations, overpay for the Products, receive Products of lesser standards than what they reasonably expected to receive, and are exposed to increased health risks. Consumers cannot avoid any of the injuries caused by Defendant's deceptive labeling and advertising of the Products. Accordingly, the injuries caused by Defendant's deceptive labeling and advertising outweigh any benefits.

82. **Balancing Test.** Some courts conduct a balancing test to decide if a challenged activity amounts to unfair conduct under California Business and Professions Code Section 17200. They "weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012).

83. **No Utility.** Here, Defendant's conduct of labeling the Products with the Material Omission when the Products leach microplastics into milk or formula during ordinary use has no utility and financially harms purchasers. Thus, the utility of Defendant's conduct is vastly outweighed by the gravity of harm.

84. **Legislative Declared Policy.** Some courts require that "unfairness must be tethered to some legislative declared policy or proof of some actual or threatened impact on competition." *Lozano v. AT&T Wireless Servs. Inc.*, 504 F. 3d 718, 735 (9th Cir. 2007).

85. **Unfair Conduct.** Defendant's labeling and advertising of the Products, as alleged herein, is deceptive, misleading, and unreasonable, and constitutes unfair conduct. Defendant knew or should have known of its unfair conduct. Defendant's Material Omission constitutes an unfair business practice within the meaning of California Business and Professions Code Section 17200.

86. **Reasonably Available Alternatives.** There existed reasonably available alternatives to further Defendant's legitimate business interests, other than the conduct described herein. Defendant could have refrained from labeling the Products with the Material Omission.

87. **Defendant's Wrongful Conduct.** All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct repeated on thousands of occasions daily.

41
FIRST AMENDED CLASS ACTION COMPLAINT

88. **Injunction.** Pursuant to Business and Professions Code Sections 17203, Plaintiffs and the California Subclass seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practices of labeling the Products with the Material Omission.

89. **Causation/Damages.** Plaintiffs and the California Subclass have suffered injury in fact, have lost money and were exposed to increased health risks as a result of Defendant's unfair conduct. Plaintiffs and the California Subclass paid an unwarranted premium for these Products. Specifically, Plaintiffs and the California Subclass paid for Products that are free from harmful plastic exposure. Plaintiffs and the California Subclass would not have purchased the Products, or would have paid substantially less for the Products, if they had known that the Products' advertising and labeling were deceptive. Accordingly, Plaintiffs seek damages, restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

### *"Fraudulent" Prong*

90. **Fraud Standard.** The UCL considers conduct fraudulent (and prohibits said conduct) if it is likely to deceive members of the public. *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1267 (1992).

91. **Fraudulent & Material Omission.** Defendant used the Material Omission with the intent to sell the Products to consumers, including Plaintiffs and the California Subclass. The Material Omission are deceptive, and Defendant knew, or should have known, of their deception. The Material Omission are likely to mislead consumers into purchasing the Products because they are material to the average, ordinary, and reasonable consumer.

92. **Fraudulent Business Practice.** As alleged herein, the misrepresentations by Defendant constitute a fraudulent business practice in violation of California Business & Professions Code Section 17200.

93. **Reasonable and Detrimental Reliance.** Plaintiffs and the California Subclass reasonably and detrimentally relied on the Material Omission to their detriment in that they purchased the Products.

94. **Reasonably Available Alternatives.** Defendant had reasonably available alternatives to further its legitimate business interests, other than the conduct described herein. Defendant could

Clarkson Law Firm, P.C.   |   22525 Pacific Coast Highway   |   Malibu, CA 90265

Clarkson Law Firm, P.C. | 22525 Pacific Coast Highway | Malibu, CA 90265

have refrained from labeling the Products with the Material Omission.

95.     **Business Practice.** All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct.

96.     **Injunction.** Pursuant to Business and Professions Code Sections 17203, Plaintiffs and the California Subclass seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of labeling the Products with the Material Omission.

97.     **Causation/Damages.** Plaintiffs and the California Subclass have suffered injury in fact and have lost money as a result of Defendant's fraudulent conduct. Plaintiffs paid an unwarranted premium for the Products.  Specifically, Plaintiffs and the California Subclass paid for Products that were safe from plastic exposure, when, in fact, the Products leach harmful microplastics into the milk or formula. Plaintiffs and the California Subclass would not have purchased the Products if they had known the truth. Accordingly, Plaintiffs seek damages, restitution, and/or disgorgement of ill-gotten gains pursuant to the UCL.

### *"Unlawful" Prong*

98.     **Unlawful Standard.** The UCL identifies violations of other laws as "unlawful practices that the unfair competition law makes independently actionable." *Velazquez v. GMAC Mortg. Corp.*, 605 F. Supp. 2d 1049, 1068 (C.D. Cal. 2008).

99.     **Violations of CLRA and FAL.** Defendant's labeling of the Products, as alleged herein, violates California Civil Code sections 1750, *et seq.* (the "**CLRA**") and California Business and Professions Code sections 17500, *et seq.* (the "**FAL**") as set forth below in the sections regarding those causes of action.

100.     **Fraud.** Additionally, Defendant's use of the Material Omission to sell the Products violates California Civil Code sections 1572 (actual fraud), 1573 (constructive fraud), 1709-1710 (fraudulent deceit), and 1711 (deceit upon the public), as set forth above.

101.     **Additional Violations.** Defendant's conduct in making the false representations and deceptive omission described herein constitutes a knowing failure to adopt policies in accordance with and/or adherence to applicable laws, as set forth herein, all of which are binding upon and

burdensome to its competitors. This conduct engenders an unfair competitive advantage for Defendant, thereby constituting an unfair, fraudulent and/or unlawful business practice under California Business & Professions Code sections 17200-17208. Additionally, Defendant's omission of material facts, as set forth herein, violate California Civil Code sections 1572, 1573, 1709, 1710, 1711, and 1770, as well as the common law.

102. **Unlawful Conduct.** Defendant's packaging, labeling, and advertising of the Products, as alleged herein, are deceptive, misleading, and unreasonable, and constitute unlawful conduct. Defendant knew or should have known of its unlawful conduct.

103. **Reasonably Available Alternatives.** Defendant had reasonably available alternatives to further its legitimate business interests, other than the conduct described herein. Defendant could have refrained from labeling the Products with the Material Omission.

104. **Business Practice.** All of the conduct alleged herein occurs and continues to occur in Defendant's business. Defendant's wrongful conduct is part of a pattern or generalized course of conduct.

105. **Injunction.** Pursuant to Business and Professions Code Section 17203, Plaintiffs and the California Subclass seek an order of this Court enjoining Defendant from continuing to engage, use, or employ its practice of deceptive advertising of the Products.

106. **Causation/Damages.** Plaintiffs and the California Subclass have suffered injury in fact and have lost money as a result of Defendant's unlawful conduct. Plaintiffs and the California Subclass paid an unwarranted premium for the Products. Plaintiffs and the California Subclass would not have purchased the Products if they had known that Defendant's purposely deceived consumers into believing that the Products are free from harmful plastic exposure. Accordingly, Plaintiffs seek damages, restitution and/or disgorgement of ill-gotten gains pursuant to the UCL.

## COUNT TWO

### Violation of California False Advertising Law

### (Cal. Bus. & Prof. Code §§ 17500, *et seq.*)

### (*On Behalf of the California Subclass*)

107. **Incorporation by reference.** Plaintiffs re-allege and incorporate by reference all

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1    allegations contained in this complaint, as though fully set forth herein.

2        108.    **California Subclass.** Plaintiffs bring this claim individually and on behalf of the

3    California Subclass who purchased the Products within the applicable statute of limitations.

4        109.    **FAL Standard.**   The False Advertising Law, codified at Cal. Bus. & Prof. Code

5    section 17500, *et seq.*, prohibits "unfair, deceptive, untrue or misleading advertising[.]"

6        110.    **Material Omission Disseminated to the Public.** Defendant violated section 17500

7    when it advertised and marketed the Products through the unfair, deceptive, and misleading

8    omission disseminated to the public through the Products' labeling, packaging, and advertising. The

9    Material Omission was deceptive because the Products do not conform to them. The Material

10   Omission was material because it is likely to and did mislead reasonable consumers into purchasing

11   the Products.

12       111.    **Knowledge.** In making and disseminating the Material Omission alleged herein,

13   Defendant knew or should have known that the Material Omission was untrue or misleading, and

14   acted in violation of § 17500.

15       112.    **Exclusive Knowledge.** Defendant has exclusive knowledge of the Products' danger

16   to leach microplastics. Defendant, as the manufacturer of the Products, is in a superior knowledge

17   position to consumers, including Plaintiffs, to know about the microplastics danger. Defendant's

18   control of the manufacturing, design, distribution, and safety testing of the Products gives Defendant

19   exclusive knowledge of the presence of the Material Danger.

20       113.    **Intent to sell.** Defendant's Material Omission were specifically designed to induce

21   reasonable consumers, like Plaintiffs and the California Subclass, to purchase the Products.

22       114.    **Causation/Damages.** As a direct and proximate result of Defendant's misconduct in

23   violation of the FAL, Plaintiffs and members of the California Subclass were harmed in the amount

24   of the purchase price they paid for the Products. Further, Plaintiffs and members of the Class have

25   suffered and continue to suffer economic losses and other damages including, but not limited to, the

26   amounts paid for the Products, and any interest that would have accrued on those monies, in an

27   amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for violation of the FAL

28   in damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

California Subclass for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

**COUNT THREE**

**Violation of California Consumers Legal Remedies Act**

**(Cal. Civ. Code §§ 1750, *et seq.*)**

**(*On Behalf of the California Subclass*)**

115. **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

116. **California Subclass.** Plaintiffs bring this claim individually and on behalf of the California Subclass who purchased the Products within the applicable statute of limitations.

117. **CLRA Standard.** The CLRA provides that "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer are unlawful."

118. **Goods/Services.** The Products are "goods," as defined by the CLRA in California Civil Code § 1761(a).

119. **Defendant.** Defendant is a "person," as defined by the CLRA in California Civil Code § 1761(c).

120. **Consumers.** Plaintiffs and members of the California Subclass are "consumers," as defined by the CLRA in California Civil Code § 1761(d).

121. **Transactions.** The purchase of the Products by Plaintiffs and members of the California Subclass are "transactions" as defined by the CLRA under California Civil Code § 1761(e).

122. **Violations of the CLRA.** Defendant violated the following sections of the CLRA by selling the Products to Plaintiffs and the California Subclass through the misleading, deceptive, and fraudulent Material Omission:

   a. Section 1770(a)(5) by representing that the Products have "characteristics, . . . uses [or] benefits . . . which [they] do not have."

   b. Section 1770(a)(7) by representing that the Products "are of a particular standard, quality, or grade . . . [when] they are of another."

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

c.   Section 1770(a)(9) by advertising the Products "with [the] intent not to sell them as advertised."

123.   **Knowledge.** Defendant's uniform and material omission of the Material Danger regarding the Products was likely to deceive, and Defendant knew or should have known that its omission and misrepresentations were misleading.

124.   **Exclusive Knowledge.** Defendant has exclusive knowledge of the Products' danger to leach microplastics. Defendant, as the manufacturer of the Products, is in a superior knowledge position to consumers, including Plaintiffs, to know about the microplastics danger. Defendant's control of the manufacturing, design, distribution, and safety testing of the Products gives Defendant exclusive knowledge of the presence of the Material Danger.

125.   **Malicious.** Defendant's conduct is malicious, fraudulent, and wanton in that Defendant intentionally misled and withheld material information from consumers, including Plaintiffs, to increase the sale of the Products.

126.   **Plaintiffs Could Not Have Avoided Injury.** Plaintiffs and members of the California Subclass could not have reasonably avoided such injury.  Plaintiffs and members of the California Subclass were misled and unaware of the existence of facts that Defendant suppressed and failed to disclose, and Plaintiffs and members of the California Subclass would not have purchased the Products and/or would have purchased them on different terms had they known the truth.

127.   **Causation/Reliance/Materiality.** Plaintiffs and the California Subclass suffered harm as a result of Defendant's violations of the CLRA because they relied on the Material Omission in deciding to purchase the Products. The Material Omission were together a substantial factor. The Material Omission was material because a reasonable consumer would consider it important in deciding whether to purchase the Products.

128.   **Section 1782(d)—Prelitigation Demand/Notice.** More than thirty days prior to the filing of this complaint, on or about February 5, 2024, Plaintiffs' counsel, acting on behalf of all members of the Class, mailed a Demand Letter, via U.S. certified mail, return receipt requested, addressed to Defendant Handi-Craft Company, Inc. at its headquarters and principal place of business registered with the California Secretary of State (4433 Fyler Ave., St. Louis, Missouri

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

63116) and to its registered agent for service of process at the same address, which were delivered to that address on or about February 12, 2024.

129. **Causation/Damages.** As a direct and proximate result of Defendant's misconduct in violation of the CLRA, Plaintiffs and members of the California Subclass were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at trial. Accordingly, Plaintiffs seek a monetary award for violation of this Act in the form of damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the California Subclass for said monies.

130. **Injunction.** Given that Defendant's conduct violated California Civil Code section 1780, Plaintiffs and members of the California Subclass are entitled to seek, and do hereby seek, injunctive relief to put an end to Defendant's violations of the CLRA and to dispel the public misperception generated, facilitated, and fostered by Defendant's false advertising campaign. Plaintiffs have no adequate remedy at law. Without equitable relief, Defendant's unfair and deceptive practices will continue to harm Plaintiffs and the California Subclass. Accordingly, Plaintiffs seek an injunction to enjoin Defendant from continuing to employ the unlawful methods, acts, and practices alleged herein pursuant to section 1780(a)(2), and otherwise require Defendant to take corrective action necessary to dispel the public misperception engendered, fostered, and facilitated through Defendant's deceptive labeling of the Products with the Material Omission.

131. **Punitive Damages.** Defendant's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendant's misconduct is malicious as Defendant acted with the intent to cause Plaintiffs and consumers to pay for Products that they were not, in fact, receiving. Defendant willfully and knowingly disregarded the rights of Plaintiffs and consumers as Defendant was, at all times, aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiff. Defendant's misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people

would look down upon it and/or otherwise would despise such corporate misconduct. Said misconduct subjected Plaintiffs and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendant's misconduct is fraudulent as Defendant, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiffs and consumers.  The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendant. Accordingly, Plaintiffs seek an award of punitive damages against Defendant.

**COUNT FOUR**

**Breach of Warranty**

***(On Behalf of the Nationwide Class and California Subclass)***

132.    **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

133.    **Nationwide Class & California Subclass.** Plaintiffs bring this claim individually and on behalf of the Nationwide Class and California Subclass who purchased the Products within the applicable statute of limitations.

134.    **Pre-suit Notice.** Over four months prior to the filing of this complaint, on or about February 5, 2024, Plaintiffs' counsel, acting on behalf of all members of the Class, mailed a Demand Letter, via U.S. certified mail, return receipt requested, addressed to Defendant Handi-Craft Company, Inc. at its headquarters and principal place of business registered with the California Secretary of State (4433 Fyler Ave., St. Louis, MO 63116) and its registered agent for service of process at the same address, which were delivered to that address on or about February 12, 2024. The letter described Defendant's misrepresentations, requested remedies, and gave Defendant ample time to respond.

135.    **Express Warranty.** By advertising and selling the Products at issue, Defendant made promises and affirmations of fact on the Products' packaging and labeling, and through its marketing and advertising, as described herein. This labeling and advertising constitute express warranties and became part of the basis of the bargain between Plaintiffs and members of the Class and Defendant. Defendant purports, through the Products' labeling and advertising, to create express warranties that

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

the Products, among other things, conform to the Material Omission.

136.    **Implied Warranty of Merchantability.** By advertising and selling the Products at issue, Defendant, a merchant of goods, made promises and affirmations of fact that the Products are merchantable and conform to the promises or affirmations of fact made on the Products' packaging and labeling, and through its marketing and advertising, as described herein. This labeling and advertising, combined with the implied warranty of merchantability, constitute warranties that became part of the basis of the bargain between Plaintiffs and members of the Class and Defendant—to wit, that the Products, among other things, conform to the Material Omission.

137.    **Breach of Warranty.** Contrary to Defendant's warranties, the Products do not conform to the Material Omission, therefore, Defendant breached its warranties about the Products and their qualities.

138.    **Exclusive Knowledge.** Defendant has exclusive knowledge of the Products' danger to leach microplastics. Defendant, as the manufacturer of the Products, is in a superior knowledge position to consumers, including Plaintiffs, to know about the microplastics danger. Defendant's control of the manufacturing, design, distribution, and safety testing of the Products gives Defendant exclusive knowledge of the presence of the Material Danger.

139.    **Prelitigation Demand/Notice.** More than thirty days prior to the filing of this complaint, on or about February 5, 2024, Plaintiffs' counsel, acting on behalf of all members of the Class, mailed a Demand Letter, via U.S. certified mail, return receipt requested, addressed to Defendant Handi-Craft Company, Inc. at is headquarters and principal place of business registered with the California Secretary of State (4433 Fyler Ave., St. Louis, MO 63116) and to its registered agent for service of process at the same address, which were delivered to that addresses on or about February 12, 2024. The Demand Letter notified Defendant of its breach of warranty.

140.    **Causation/Remedies.** As a direct and proximate result of Defendant's breach of warranty, Plaintiffs and members of the Class were harmed in the amount of the purchase price they paid for the Products. Further, Plaintiffs and members of the Class have suffered and continue to suffer economic losses and other damages including, but not limited to, the amounts paid for the Products, and any interest that would have accrued on those monies, in an amount to be proven at

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

trial. Accordingly, Plaintiffs seek a monetary award for breach of warranty in the form of damages, restitution, and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies, as well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that will result.

141.    **Punitive Damages.** Plaintiffs seek punitive damages pursuant to this cause of action for breach of warranty on behalf of Plaintiffs and the Class. Defendant's unfair, fraudulent, and unlawful conduct described herein constitutes malicious, oppressive, and/or fraudulent conduct warranting an award of punitive damages as permitted by law. Defendant's misconduct is malicious as Defendant acted with the intent to cause Plaintiffs and consumers to pay for Products that they were not, in fact, receiving.  Defendant willfully and knowingly disregarded the rights of Plaintiffs and consumers as Defendant was aware of the probable dangerous consequences of its conduct and deliberately failed to avoid misleading consumers, including Plaintiff. Defendant's misconduct is oppressive as, at all relevant times, said conduct was so vile, base, and/or contemptible that reasonable people would look down upon it and/or otherwise would despise such misconduct.  Said misconduct subjected Plaintiffs and consumers to cruel and unjust hardship in knowing disregard of their rights. Defendant's misconduct is fraudulent as Defendant, at all relevant times, intentionally misrepresented and/or concealed material facts with the intent to deceive Plaintiffs and consumers. The wrongful conduct constituting malice, oppression, and/or fraud was committed, authorized, adopted, approved, and/or ratified by officers, directors, and/or managing agents of Defendant.

**COUNT FIVE**

**Unjust Enrichment/Restitution**

***(On Behalf of the Nationwide Class and California Subclass)***

142.    **Incorporation by Reference.** Plaintiffs re-allege and incorporate by reference all allegations contained in this complaint, as though fully set forth herein.

143.    **Nationwide Class & California Subclass.** Plaintiffs bring this claim individually and on behalf of the Nationwide Class and California Subclass who purchased the Products within the applicable statute of limitations.

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

1    144.   **Plaintiffs/Class Conferred a Benefit.** By purchasing the Products, Plaintiffs and

2    members of the Class conferred a benefit on Defendant in the form of the purchase price of the

3    Products.

4    145.   **Defendant's Knowledge of Conferred Benefit.** Defendant had knowledge of such

5    benefit and Defendant appreciated the benefit because, were consumers not to purchase the

6    Products, Defendant would not generate revenue from the sales of the Products.

7    146.   **Exclusive Knowledge.** Defendant has exclusive knowledge of the Products' danger

8    to leach microplastics. Defendant, as the manufacturer of the Products, is in a superior knowledge

9    position to consumers, including Plaintiffs, to know about the microplastics danger. Defendant's

10   control of the manufacturing, design, distribution, and safety testing of the Products gives Defendant

11   exclusive knowledge of the presence of the Material Danger.

12   147.   **Defendant's Unjust Receipt Through Deception.** Defendant's knowing acceptance

13   and retention of the benefit is inequitable and unjust because the benefit was obtained by

14   Defendant's fraudulent, misleading, and deceptive omission.

15   148.   **Causation/Damages.** As a direct and proximate result of Defendant's unjust

16   enrichment, Plaintiffs and members of the Class were harmed in the amount of the purchase price

17   they paid for the Products. Further, Plaintiffs and members of the Class have suffered and continue

18   to suffer economic losses and other damages including, but not limited to, the amounts paid for the

19   Products, and any interest that would have accrued on those monies, in an amount to be proven at

20   trial. Accordingly, Plaintiffs seek a monetary award for unjust enrichment in damages, restitution,

21   and/or disgorgement of ill-gotten gains to compensate Plaintiffs and the Class for said monies, as

22   well as injunctive relief to enjoin Defendant's misconduct to prevent ongoing and future harm that

23   will result.

24   **VIII.  PRAYER FOR RELIEF**

25   149.   WHEREFORE, Plaintiffs, individually and on behalf of all others similarly situated,

26   pray for judgment against Defendant as follows:

27        a.   **Certification:** For an order certifying this action as a class action, appointing
          Plaintiffs as the Class Representatives, and appointing Plaintiffs' Counsel as Class
28        Counsel;

Clarkson Law Firm, P.C.  |  22525 Pacific Coast Highway  |  Malibu, CA 90265

b. **Declaratory Relief:** For an order declaring that Defendant's conduct violates the statutes and laws referenced herein consistent with applicable law and pursuant to only those causes of action so permitted;

c. **Injunction:** For an order requiring Defendant to change its business practices to prevent or mitigate the risk of the consumer deception and violations of law outlined herein. This includes, for example, orders that Defendant immediately cease and desist from selling the unlawful Products in violation of law; that enjoin Defendant from continuing to market, advertise, distribute, and sell the Products in the unlawful manner described herein; that require Defendant to add appropriate warning labels or engage in an affirmative advertising campaign to dispel the public misperception of the Products resulting from Defendant's unlawful conduct; and/or that require Defendant to take all further and just corrective action, consistent with applicable law and pursuant to only those causes of action so permitted;

d. **Damages/Restitution/Disgorgement:** For an order awarding monetary compensation in the form of damages, restitution, and/or disgorgement to Plaintiffs and the Class, consistent with applicable law and pursuant to only those causes of action so permitted;

e. **Punitive Damages/Penalties:** For an order awarding punitive damages, statutory penalties, and/or monetary fines, consistent with applicable law and pursuant to only those causes of action so permitted;

f. **Attorneys' Fees & Costs:** For an order awarding attorneys' fees and costs, consistent with applicable law and pursuant to only those causes of action so permitted;

g. **Pre/Post-Judgment Interest:** For an order awarding pre-judgment and post-judgment interest, consistent with applicable law and pursuant to only those causes of action so permitted; and

h. **All Just & Proper Relief:** For such other and further relief as the Court deems just and proper.

## IX.    DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury on all issues and causes of action so triable.

Respectfully submitted,

DATED: October 15, 2024                **CLARKSON LAW FIRM, P.C.**

By: _/s/ Bahar Sodaify_____
        Ryan J. Clarkson, Esq.
        Bahar Sodaify, Esq.
        Alan Gudino, Esq.
        Samuel M. Gagnon, Esq.

        *Attorneys for Plaintiffs*